(196 P.3d 422)
No. 97,785

STATE OF KANSAS, *Appellee,* v. BRANDON LESLIE MORRIS, *Appellant.*

Opin-
ion filed November 21, 2008.

*Rachel Pickering*, of Kansas Appellate Defender Office, for appellant.

*Sherri Schuck*, county attorney, and *Stephen N. Six*, attorney general, for appellee.

Before GREENE, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Brandon Morris appeals from his convictions by a jury and his sentence for two counts of aggravated indecent liberties with a child. First, Morris contends that the trial court erroneously admitted evidence of the victim's allegations of his prior bad acts. Nevertheless, Morris' failure to make a timely specific objection to this evidence at trial precludes appellate review of this issue. Next, Morris contends that the trial court improperly allowed the State to introduce evidence of other uncharged crimes through his former wife's testimony. As in the previous issue, Morris' failure

to make a timely specific objection to this evidence at trial precludes appellate review of this issue.

Morris also contends that the trial court erred in refusing to grant a mistrial after the State's witness violated the trial court's order in limine that the witness would not be permitted to testify as an expert. We agree that the questions by the prosecutor and the responsive testimony by the State's witness violated the trial court's order in limine. Moreover, when considering this error along with the prosecutorial misconduct outlined hereafter, we determine that reversible error existed in this case.

Finally, Morris argues that he is entitled to a new trial as a result of prosecutorial misconduct. We agree. The prosecutor's examination questions to witnesses and remarks in closing argument to the jury, which stated the prosecutor's personal opinion of witnesses' credibility; suggested to the jury that it should abandon its common sense when considering these kinds of cases; expressed the prosecutor's personal belief on matters outside the evidence; vouched for the State of Kansas; referred to matters not in evidence; vouched for the credibility of the State's witness; solicited testimony from the defendant on the credibility of another witness; buttressed the credibility of the State's witness; and appealed to the passion and prejudice of the jury were improper and constituted prejudicial error because the questions and remarks called the jurors' attention to matters that would not have been proper for them to consider in arriving at their verdict. Accordingly, we reverse and remand for a new trial.

This appeal stems from Morris' two convictions of aggravated indecent liberties with J.M. Morris does not challenge the sufficiency of the evidence to support his convictions. Viewed in the light most favorable to the State, the evidence presented at his trial was as follows:

Brandon and Thea Morris married in July 2002. They have two biological children together, and Morris adopted Thea's daughter, J.M., born January 23, 1999. Although their marriage was volatile at times, Thea had considered Morris a good father.

One night in the summer of 2005, J.M. was sleeping in her brother's bed because Thea was organizing J.M.'s room. J.M.'s

brother was spending the night at the home of Morris' mother, Cathy Morris. Thea was sleeping in a chair in the living room when Morris came home very drunk in the middle of the night. Morris did not seem to know where he was, urinated on the carpet, and then lay down on the floor. Annoyed, Thea turned out the light. Thea then heard Morris stumble down the hallway, go into the room where J.M. was sleeping, and get on the bed. Thea later heard J.M. ask Morris what he was doing. Thea got up to investigate.

Thea and Morris met at the bedroom doorway. Thea went in to check on J.M., and Morris went and sat on the couch. J.M., who was now awake, went to the restroom. At that time, she asked Thea why Morris had pulled her pants down. Morris heard J.M., but he said that he did not know what she was talking about. Thea asked J.M. what had happened. J.M. repeated that Morris had pulled down her pants. J.M. also told Thea it looked like Morris was going to kiss her but he jumped up when he heard Thea coming. J.M. said that Morris did not touch her. J.M. abruptly stopped talking and did not say anymore. Thea told her to go to sleep. Thea went back to the living room. Morris had passed out on the couch.

The next morning, Thea questioned Morris about the night before. Morris could not remember anything and was upset to learn what J.M. said had happened. Thea and Morris then talked to J.M., explaining that what had happened was wrong and that Morris was drunk and did not know where he was. They also told J.M. that if anything ever happened like that she should tell anybody with whom she felt comfortable. Thea did not report the incident to authorities because she genuinely believed that Morris was so drunk that he did not know what he was doing. (This incident will be referred to as "the summer 2005 incident.")

At the end of December 2005, Thea and Morris' relationship further deteriorated. Thea found a place of her own to live. After Thea told Morris she was leaving, he angrily filed for divorce and obtained temporary custody of the children. When Morris and Thea later reconciled, Morris dismissed the divorce proceedings.

Additional fights, trial separations, and reconciliations between Morris and Thea ensued, culminating in an agreed separation in

March 2006. Morris moved out and went to stay with his sister Miranda (Randi) Morris in Wamego.

On Wednesday, April 5, 2006, Morris and Thea amicably discussed their separation. Thea and Morris agreed to share parenting responsibilities. Morris left Thea's home around 10 p.m. to return to Wamego. The next night, when Morris brought the children to Thea's, J.M. begged Thea to let her stay with Thea, but Thea made J.M. go with Morris so he could take her to school the next morning. Before Morris left with the children, Thea informed him of her plans to go out with coworkers the following Friday night.

Late that Friday night, Thea returned home and was confronted by Morris, who was drunk and angry because he thought Thea had been with another man. Morris physically attacked Thea, which Thea said he had not done in 3 years. Early the next morning, Thea received a call from Randi, who warned Thea that Morris had a gun and had disappeared. Frightened, Thea fled to her mother's home in Olathe.

At some point, Thea had obtained a restraining order against Morris, prohibiting him from contacting her or the children. Early Sunday morning, Thea drove back to Wamego in the middle of the night with a police escort, picked up the children from Morris' mother's house, and took them to Olathe. The next day, Randi called Thea and told her Morris had checked himself into a hospital. When the children later asked where Morris was, Thea told them Morris was getting help.

During this period, while at Thea's sister's house, J.M. said that Morris had inappropriately touched her several times. J.M. told Thea that one night when Thea did not come home, Morris picked J.M. up from Cathy's house in the middle of the night, took her out on a dirt road in his truck, and asked her to take her clothes off. J.M. told Thea that Morris then "pressed his peepee on hers and it hurt really bad and made her pee." Thea determined that the incident must have occurred approximately December 2 or 3, 2005, the night she did not come home after she and Morris had argued. (This incident will be referred to as "the truck incident.")

J.M. then told Thea about another incident that occurred at the trailer in Wamego, after Thea and Morris had separated. J.M.

stated that she was asleep when Morris came into her room, lay down with her, and took off her pants and underwear. J.M. pointed to where Morris had touched her. J.M. told Thea she wanted to scream for her Aunt Randi, but she was scared. It was later determined that this incident occurred on April 5, 2006—the same night Thea and Morris had gone out and discussed their separation. (This incident will be referred to as "the incident at Aunt Randi's.")

Thea testified that J.M. said that she did not tell Thea about these incidents because Morris had threatened that Thea would go to jail and that J.M. would have to live with Cathy if J.M. told anyone. Nevertheless, J.M.'s testimony partially contradicted that given by Thea. While J.M. did testify that Morris had told her that she would have to live with Cathy if she told anyone, she denied that Morris had threatened that Thea would go to jail.

Thea testified that she called the police shortly after J.M. told her about the incidents. Olathe law enforcement reported the matter to the Wamego Police Department. Police officers met with Thea and J.M. the next day. Becky Woodward, a children and family services investigator with the Kansas Department of Social and Rehabilitation Services (SRS) in Wamego, was assigned to work with Wamego law enforcement to investigate J.M.'s allegations. Woodward conducted a videotaped interview of J.M., which Officer Matt Pfrang observed.

Woodward used anatomical diagrams representing J.M. and Morris to establish that J.M. referred to both her vagina and a male penis as a "private"; to female breasts as "boobs"; to male breasts as "nipples"; and to a bottom as "gluteus maximus." Woodward then discussed "touches" with J.M. J.M. told Woodward that the touches she liked were hugs and kisses from Thea and Morris. J.M. then explained that the touches that she did not like included when her mom hurt her private once when her mom put powder on J.M.'s rash in that area. When asked if there were any other touches that J.M. did not like, J.M. responded, "Yes, a lot from my dad and I don't like it."

J.M. then described in more exact, but disjointed, detail the summer 2005 incident, the truck incident, and the incident at Aunt Randi's. J.M. told Woodward that during the truck incident and

the incident at Aunt Randi's, Morris had either touched or penetrated her private or her gluteus maximus, or both, with either his private or his finger, or both. J.M. also demonstrated for Woodward how Morris had spit on his fingers before touching her private.

When Woodward asked J.M. to describe where the truck incident had occurred, J.M. described parking on a gravel road near a church sign with the number 3 on it. Officer Pfrang was later able to corroborate that such a sign existed near the Morrises' former rental home in Wabaunsee County. J.M. also told Woodward that during the truck incident, a man, whom J.M. initially said was a police officer but then later described as a "regular" person, approached the truck and asked Morris a few questions. J.M. said that after the man left, Morris continued touching her.

In giving Woodward additional details of the summer 2005 incident, J.M. said that when Morris had touched her stomach and pulled down her pants and underwear, Morris covered her mouth, but she was able to twice pull his hand off and yelled for Thea. J.M. also said that Morris lied to Thea when she came into the room, telling Thea that he was giving J.M. a hug and kiss. J.M. told Woodward that Morris had apologized after the summer 2005 incident, but J.M. never said that Morris had touched her during that incident.

Two days after interviewing Thea and J.M., Officer Pfrang called Morris, who voluntarily came to the police station for an interview. At some point, Pfrang *Mirandized* Morris, and Morris agreed to speak to him without an attorney. During the interview, Morris suggested J.M.'s allegations arose because he and Thea had separated and were divorcing. When Pfrang asked about the summer 2005 incident, Morris acknowledged familiarity with the allegation. Morris explained that he was drunk and had mistakenly gone in that room and lay down, but he insisted nothing happened.

Morris denied any involvement in the other incidents and suggested that Thea and her mother had programmed J.M. to make the allegations. Morris also told Pfrang that J.M. could have been molested by his 13-year-old nephew because Morris had caught his nephew and J.M. in a sexual position. The nephew was also caught pulling on Morris' son's penis. Morris said he and Thea did

not report the incidents because the nephew was a child and was in counseling. Morris also gave Pfrang an alibi for the December 2005 night the truck incident was alleged to have happened.

A physical and gynecological examination of J.M. on April 14, 2006, was normal: her hymen had not been disrupted, and her anogenital examination was normal. Nevertheless, the nurse practitioner who performed J.M.'s examination testified it was not unusual for a child reporting sexual abuse to have a normal examination because vaginal injuries heal quickly. Thus, a normal examination could not affirmatively rule out sexual abuse.

The State charged Morris in Pottawatomie County with two counts of aggravated indecent liberties with a child. Count I charged that the crime occurred "on or between the 1st day of June, 2005, and the 31st day of August, 2005" (the summer 2005 incident); Count II charged that the crime occurred on or about April 5, 2006 (the incident at Aunt Randi's).

At the preliminary hearing, J.M. testified about the charged incidents and the truck incident with some minor variations. J.M. also testified that just before the truck incident (on the same day), Morris had also inappropriately touched her at a motel. Apparently, J.M. first divulged details of this motel incident during her second therapy session with her therapist, Kay Spaniol.

Before trial, Morris moved to exclude evidence of the December 2005 motel and truck incidents. Before ruling on the motions, the trial court stated that it had thoroughly reviewed the transcript of the preliminary hearing conducted by a district court magistrate judge. The trial court ultimately ruled that the evidence of the motel and the truck incidents were admissible under K.S.A. 60-455. The trial judge stated the following reasons for admitting the evidence:

"I think that it does go to prove a material fact which could include motive, each time this happened, there were altercations or disputes or problems between he and his wife, and each time that this happened, it was not a just come home on a Wednesday night, crawl into bed late and do it. There was a problem with his wife and him. I think there is some opportunity, especially taking her, if he did take her to a motel which he admitted going to a motel. They found a key to a motel in his car, although I don't know if anybody has ever recovered the key and went to the motel and had somebody check and see if he signed in, but obviously

there is an opportunity there. And I think some of it probably goes to intent. If he removed her from the house where she was at and took her to a hotel, I don't know what the other reasoning could be for doing that, and then taking her from there in a truck somewhere out in the country and allegedly doing it again. Identity, I think it's probably going to be somewhat important this licking motion for want of a better word comes in. It does help establish that it is him and not the cousin that somehow or another came up. But I think also when the first one is done [(the summer 2005 incident)], there was a lot of discourse about him being intoxicated, that maybe he didn't know what he was doing, that mom said he was drunk, drunker than she had ever seen him. And I think with these other two, it shows there was an absence of mistake, or accident, so for those reasons, I'm going to allow that evidence to come in in the State's case in chief."

Just before the jury trial was to begin, the trial court reiterated that it was allowing the evidence of the truck and motel incidents under K.S.A. 60-455 to prove motive, intent, and absence of mistake or accident. Specifically, the trial judge held:

"The first [reason the evidence can come in] is motive. As I understand the testimony there was some testimony that these happened while the defendant couldn't find his wife, believed the wife may have been out with other individuals, and I think that is a theme that has happened more than once. The intent pretty much runs along with it, but not only in one instance the defendant [has] claimed that his intent was innocent or that nothing happened because of an . . . amount of alcohol that was taken. Also intent may be closely related to the factor of absence of mistake or accident, which is the third one that I believe it can come in under, especially where the defendant has indicated on the first instance that he actually was in bed with this young lady but was intoxicated and nothing happened."

The trial court refused to find the evidence was admissible to show plan because it did not "think taking somebody's pants down is a 'signature' offense in that regard."

The State's theory at trial was that on each of the occasions, Morris sexually abused J.M. because he was angry with Thea. The State opined that J.M. waited to reveal the incidents because Morris was "getting help," so J.M. knew she was safe to disclose the other incidents.

Before the jury retired for deliberations, the trial court instructed the jury that evidence admitted tending to prove that Morris committed a crime other than the present crimes charged "may

be considered solely for the purpose of proving the defendant's intent, or the absence of mistake or accident."

The jury convicted Morris of both counts. The trial court sentenced Morris to a controlling presumptive term of 216 months in prison.

*When Morris failed to object to evidence of prior bad acts or other crimes, did he preserve this issue for appeal?*

Morris' first and second issues on appeal concern evidence of uncharged crimes or prior bad acts that Morris maintains was erroneously admitted in violation of K.S.A. 60-455. Specifically, in his first issue on appeal, Morris maintains that the trial court erroneously admitted evidence of J.M.'s allegations regarding the motel and truck incidents. Morris contends that the trial court's admission of that evidence under K.S.A. 60-455 was erroneous because motive, intent, and absence of mistake or accident—the limited reasons for which the trial court held the evidence would be admissible—were not disputed or were not material facts in his trial. Further, Morris contends that even if those matters were material and the evidence was relevant to those facts, the evidence should have been excluded as more prejudicial than probative.

In addition, Morris complains that the trial court improperly allowed the State to introduce evidence of other uncharged crimes. Specifically, the State elicited testimony from Thea that Morris had physically harmed her on at least one previous occasion and that Morris had tried to elude the police in a car in which she was the passenger.

*Did Morris make a timely specific objection concerning the motel and truck incidents?*

Morris failed to object to the evidence involving the motel and truck incidents. To preserve an issue relating to the admissibility of evidence for appeal, a party must make a timely and specific objection. K.S.A. 60-404. Even if there is an in limine ruling that the evidence is admissible, where an objection to the evidence is not made when it is introduced at trial, the defendant is generally precluded from challenging its admissibility on appeal. See *State*

*v. Carapezza,* 286 Kan. 992, Syl. ¶ 7, 191 P.3d 256 (2008) (where defendant objected to evidence only on hearsay grounds, she failed to preserve for appeal the issue of the inadmissibility of the evidence under K.S.A. 60-455); *State v. Francis,* 282 Kan. 120, 138, 145 P.3d 48 (2006) (where defendant failed to object at trial to the admission of evidence under K.S.A. 60-455, he was precluded from raising the issue on appeal); *State v. Young,* 14 Kan. App. 2d 21, 37, 784 P.2d 366, *rev. denied* 245 Kan. 788 (1989) (To preserve a K.S.A. 60-455 issue for appeal, a defendant must object on that ground at trial.). Morris, by failing to object, waived any challenge to the trial court's admission of the motel and truck evidence under K.S.A. 60-455. As a result, we conclude that Morris has failed to preserve this issue for appeal.

*Did Morris make a timely specific objection concerning the marital discord evidence?*

During the trial, Thea testified about her corrosive marriage to Morris. In describing to the jury how their marriage had disintegrated, Thea testified how Morris had once physically harmed her after she went out with a girlfriend one evening. In addition, she testified that Morris once tried to elude police while she was a passenger in a car. Morris made a late objection to the marital discord testimony based on relevancy. This objection, however, was made after Thea had testified to the physical confrontation. Moreover, the record does not show that Morris made a timely objection concerning the alleged eluding from the police incident.

Morris argues that this evidence was inadmissible under K.S.A. 60-455. Nevertheless, the contemporaneous rule requires a party to make a timely objection. See K.S.A. 60-404; *State v. Horton,* 283 Kan. 44, 63, 151 P.3d 9 (2007); *State v. Sims,* 265 Kan. 166, ¶ 6, 960 P.2d 1271 (1998) (A timely and specific objection to the admission of evidence at trial must be made in order to preserve the issue on appeal.); *Young,* 14 Kan. App. 2d at 37; 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence, § 1.4, p. 4 (5th ed. 2007).

*Did the trial court err in refusing to grant a mistrial after the State's witness testified concerning her expertise as a child therapist in*

*violation of the trial court's ruling that the witness would not be allowed to testify as an expert?*

Morris next complains that the trial court erred in failing to grant his motion for mistrial after Spaniol testified about her expertise in counseling children of sexual abuse despite the trial court's ruling that she would not be permitted to testify as an expert witness.

K.S.A. 22-3423(1)(c) provides that a trial court can terminate the trial and order a mistrial at any time that it finds termination is necessary because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." This court reviews the trial court's denial of Morris' motion for mistrial under an abuse of discretion standard. Thus, Morris must establish that by denying his motion for mistrial, the trial court abused its discretion to the prejudice of his substantial rights to a fair trial. See *State v. Albright*, 283 Kan. 418, 425-26, 153 P.3d 497 (2007).

During the State's questioning of Spaniol, the State specifically asked Spaniol about her credentials and education. Spaniol told the jury about her 15 years of work experience as a social worker. Moreover, she stated that she had a Masters degree in social work. When Spaniol testified that her expertise was in "working with children of sexual abuse," the trial judge intervened and stated the following outside the jury's presence:

"THE COURT: . . .This lady was not an endorsed witness, she was endorsed late. She has not filed a report and I have excluded part of her testimony saying anything that she says as an expert because of the fact that there was no report filed, and Mr. Roe is entitled not to be surprised. *So I don't want to hear anything else from this lady that she's an expert."* (Emphasis added.)

In addition, the prosecutor asked Spaniol about discrepancies in testimony of children who have been abused. Spaniol was allowed to testify that it was not unusual for J.M. to disclose the motel incident separately from her initial disclosure of sexual abuse.

"Q. [Prosecutor:] In your experience, did you find it unusual that [J.M.] might disclose another incident of sexual abuse other than what she had previously disclosed?

. . . .

"A. [Spaniol]: No, I didn't find it unusual at all."

Moreover, the prosecutor asked Spaniol about J.M.'s alleged desire to visit Morris:

"Q. [Prosecutor:] In your experience in dealing with children who make allegations of any abuse, is it unusual—did you find it unusual that a child would want to see someone who is suspected to be the perpetrator of that abuse?
    "[Defense Counsel:] Judge, I'm going to object to this.
    "THE COURT: Overruled.
"Q. [Prosecutor:] Did you find that unusual?
"A. [Spaniol:] In my experience it was not unusual. Children who have been very severely physically abused or sexually abused still have an attachment to that parent, and in fact some sexual abuse children may have been given special treatment.
    "[Defense Counsel:] Judge, I'm going to object to this.

    . . . .
    "THE COURT: I'm going to overrule your objection."

The answers that Spaniol gave to these questions would not have been within the common knowledge, experience, and education of the jury. Because Spaniol's answers involved special knowledge, they were given more as an expert than a lay witness. When an opinion requires special knowledge or skill, the witness may have to be offered as an expert. See K.S.A. 60-456; *State v. Amodei*, 222 Kan. 140, 146-47, 563 P.2d 440 (1977) (defense counsel was precluded from asking a lay witness: " 'Was it . . . [defendant's] desire to get away from heroin and off the habit?' " or " 'Did you see any indication . . . [defendant] ever desired to be a dealer?' ").

Although the trial court determined that the prosecutor did not violate the order in limine, we disagree. Once the jury was told about Spaniol's education and experience, the jury would have given her testimony more weight than the testimony of a lay witness. Moreover, to answer the two questions discussed here would have required the witness to have special knowledge concerning abused children. See K.S.A. 60-456(b)(2). For example, Spaniol opined that in her experience, it was not unusual for children to disclose another incident of abuse. Finally, Spaniol opined that it was not unusual for children who have been victims of abuse to still want to see or visit their alleged abuser. Because Spaniol's opinion testimony exceeded that of a lay witness, it violated the order in limine.

Obviously, Spaniol's testimony would have bolstered J.M.'s credibility. The trial court did not instruct the jury to disregard Spaniol's improper expert opinion testimony. We determine that the order in limine was violated by the prosecutor's questions and by Spaniol's answers to those questions. Moreover, we will further consider this trial error along with the next issue in determining if these errors were so prejudicial as to deny Morris a fair trial.

*Were the prosecutor's improprieties during examination of witnesses and closing argument so flagrant that reversal is required?*

Morris next argues that he is entitled to a new trial as a result of prosecutorial misconduct. Specifically, Morris argues that the prosecutor committed misconduct in the following ways: (1) injecting her personal opinion regarding defense witnesses' credibility; (2) commenting in closing argument on evidence that was not admitted at trial; and (3) eliciting inadmissible testimony from Morris concerning his opinion of J.M.'s credibility.

Regardless of whether a defendant objects to alleged prosecutorial misconduct, an appellate court applies a two-step analysis. *State v. Gunby,* 282 Kan. 39, 63, 144 P.3d 647 (2006). First, an appellate court must determine whether the prosecutor exceeded the bounds of permissible conduct. If so, the second step requires the appellate court to determine if the conduct constitutes plain error: whether the statements or conduct prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright,* 283 Kan. at 428. In the second step of the two-step analysis, the appellate court considers three factors, without any one factor individually controlling: "(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." 283 Kan. at 428.

*Personal opinion of witnesses' credibility*

Morris complains that the prosecutor committed misconduct when she on four occasions commented in closing argument on her personal opinion of defense witnesses' credibility.

First, Morris contends that the prosecutor's comments about the alibi testimony of Cathy were improper. Cathy testified from a list of dates she kept of when the Morris children stayed overnight. The list was kept at the suggestion of Morris' attorney when Morris had filed for divorce at the end of December 2005. During the State's cross-examination, Cathy was questioned about why she had not furnished the list of dates—which was potentially exculpatory because it indicated the children were with her on April 5—when she was interviewed by the police in the investigation of J.M.'s allegations. Morris asserts that the prosecutor improperly injected her own personal beliefs of whether Cathy was telling the truth. The prosecutor offered the jury this view:

"Then they meet her on the 7th of November. She doesn't say, 'You know what? I have something. I've been keeping track of this. I can tell you exactly what dates the kids were there'. Nope, doesn't say anything about it. Miraculously it appears between November 8th and the day she leaves. Now she's found it. There it is. Cathy testified to that. *I think that her motives are a little suspect here, quite honestly.*" (Emphasis added.)

Second, the prosecutor continued on the credibility of Cathy's alibi testimony:

"The defendant and his mother testified that on December 2nd he called her all the time. *I don't doubt that.* Cathy, [Morris'] mother, did watch the children. She watched them a lot of the time, *I don't doubt that.* That record, may be it starts off chronological. She doesn't record any of the times the children were there when [Morris] was home because it was designed to be used against Thea, I believe. I mean, that's what it was designed for, and I don't know that, *I think that she went back and made up all of the notes but I don't think that they were done at the time it actually happened.* It isn't a complete record. It's a record designed to be used against an individual." (Emphasis added.)

Third, Morris contends that the prosecutor's comments concerning the testimony of Kai Bloom were improper. Bloom, a friend of Morris, had furnished Morris with an alibi for the motel and truck incidents. He testified that he had gone out with Morris the night of December 2 and that Morris dropped Bloom off at his residence around 1:30 a.m. Bloom later saw Morris alone the next morning. Specifically, the prosecutor made the following comments about Bloom's testimony:

"Mr. Bloom is—I think [defense counsel] said, 'Well, he has no vested interest. He's not involved in this.' No, he probably isn't. I never said he may not have, *but I don't think he went out with him on the 2nd,* considering all of the other things that occurred that day." (Emphasis added.)

Fourth, Morris complains about an argument made by the State to rebut Morris' closing argument concerning Morris' alibi for the motel and truck incidents. Although Morris does not explain his argument, some additional background is necessary to place the State's rebuttal argument in context. Morris' counsel had argued that the evidence supported a conclusion that J.M. was at Cathy's home—not with Morris—on the night of the alleged motel and truck incidents. On that night, the defense alleged that Morris had been out late drinking with Bloom. Defense counsel urged the jury:

"Now you have to apply a little common sense to this, even though we know Morris was by himself from 1:30 to 7:00. How would he have possibly have gone to get [J.M.], bring her to the house or take her out in the country and do these horrible acts to her, get her back to Cathy without causing a big commotion, and been ready to go to work the next day? It just does not add up."

Bloom had conceded on cross-examination that the night to which he testified could have been December 9, 2005, rather than December 2-3, 2005. In rebutting the defense argument, the State suggested that the date to which Bloom had testified was actually the following weekend (December 9, 2005). Clearly, it was permissible for the State to point out the inconsistency about the dates. Yet, the prosecutor continued her rebuttal with the following personal opinion: "[Defense counsel] wants you to think logical, well, *I think it's hard in these cases to see the logic in why would anyone do something like that? I know I can't. I can't see the logic at all.*" (Emphasis added.)

Attorneys are prohibited, both by judicial precedent and by our canons of ethics from asserting their personal opinion "as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused." Rule 3.4(e) (Fairness to Opposing Party and Counsel) (2007 Kan. Ct. R. Annot. 514). Moreover, our Supreme Court recently explained:

"Generally, a prosecutor may not offer the jury his or her personal opinion as to the credibility of witnesses. [Citation omitted.] On the other hand, a prosecutor

is free to craft an argument that includes reasonable inferences to be drawn from the evidence. [Citation omitted.] That latitude would include explaining to the jury what it should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses." *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008).

In the present case, the prosecutor's closing argument was loaded with comments like the following:

(1) "I think that her [Cathy's] motives are a little suspect here, quite honestly";

(2) "I think that she [Cathy] went back and made up all of the notes but I don't think that they were done at the time it actually happened"; and

(3) "I think it's hard in these cases to see the logic in why would anyone do something like that? I know I can't. I can't see the logic at all."

Based on these comments, the prosecutor improperly stated her personal opinion as to the credibility of Cathy and to the guilt of Morris. Because Cathy was Morris' mother, it would have been proper for the prosecutor to draw attention to Cathy's possible bias. See *Com. v. Womack*, 307 Pa. Super. 396, 406, 453 A.2d 642 (1982) (comment that testimony of defendant's mother was biased). Nevertheless, it was improper for the prosecutor to express her personal belief that Cathy had fabricated the notes showing the dates she had the children overnight. Likewise, it was improper for the prosecutor to insinuate her belief about Morris' guilt: "I think it's hard in these cases to see the logic in why would anyone do something like that? I know I can't. I can't see the logic at all." See *Wilson v. State*, 371 So. 2d 126, 128 (Fla. Dist. App. 1978) (Prosecutor's remark about his personal belief in defendant's guilt was improper.).

The prosecutor's comments were improper and called to the jurors' attention her personal opinions, which were not evidence. Moreover, the personal opinions pertained to crucial matters for the jury's determination.

*Suggesting to jury to abandon common sense*

In addition, it was improper for the prosecutor to suggest to the jury that it should abandon its common sense when considering these kinds of cases because they really do not make any sense. See *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461,

*rev. denied* 263 Kan. 889 (1997) ("Juries must be given an opportunity to exercise reason and sound judgment in deciding the facts of a case, free from passion and prejudice.").

*Giving personal belief on matters outside the evidence*

The prosecutor also improperly gave her personal belief on matters outside the evidence when she stated:

"Defense I think has a basic theme, at least it appears. It's a bad divorce so [J.M.] is coming in here saying this because she's been prompted by her mother to say this. *The State believes that what happened to [J.M.] wasn't because of a bad divorce. What happened to [J.M.] is because the defendant couldn't get to her mom, and the worse way he could hurt her was to hurt her child.* There's a lot of testimony—" (Emphasis added.)

At this point, Morris' counsel objected that the State's theory was not a fair comment on the evidence. The trial judge responded, "[Defense counsel], I think that there is evidence that there is serious problems between these people and their marriage. I would suggest that [the State] move off of getting back at mom through the child." Later, the prosecutor continued as follows: *"The defendant used his daughter every time he was mad at his wife, really mad at her.* That's when he had access to [J.M.]. *He couldn't hurt Thea any more, so he did it then by hurting her child."*

With this argument, the prosecutor departed from the record to suggest to the jury the real reason that Morris would have abused J.M. Although there was evidence of marital discord between Morris and Thea, the prosecutor's comments told the jury that Morris was getting back at his wife by abusing J.M. Yet, the evidence was insufficient to allow the prosecutor to make such an assertion.

A prosecutor has a special obligation to avoid "improper suggestions, insinuations, and especially assertions of personal knowledge." *Berger v. United States,* 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). Here, the prosecutor indicated that she knew why Morris committed the alleged criminal acts and went on to explain the reasons for Morris' conduct. In doing so, the prosecutor improperly suggested that there were matters outside of the admitted evidence that would support J.M.'s testimony. By expressing her personal belief concerning matters outside the evidence, the

prosecutor's comments impinged on the jury's task of determining Morris' guilt or innocence based on the evidence presented at trial.

*Prosecutorial vouching for the State of Kansas*

In addition, by explicitly invoking the name of the State during her closing argument, the prosecutor placed the prestige of the State behind her personal beliefs about matters outside of the evidence. The prosecutor's comments represented impermissible prosecutorial vouching for the State of Kansas. Recognizing that the prosecutor is a representative of the people of Kansas, our Supreme Court in *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000), stated:

"A prosecutor is a servant of the law and a representative of the people of Kansas. We are unable to locate an excuse for a prosecutor's failure to understand the remarkable responsibility he or she undertakes when rising in a courtroom to announce an appearance for the State of Kansas. Instructional materials abound on this topic. Sixty-five years ago the United States Supreme Court said that the prosecutor represents

'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935)."

Declaring that the prosecutor in *Pabst* had improperly placed the weight of the State behind his personal opinions that the defendant was lying, our Supreme Court stated:

"He ignored his special obligation as a prosecutor to avoid improper personal insinuations. Because he represented the State of Kansas the jury might have been misled into thinking his personal opinions were validated by the weight of the State of Kansas. *Such prosecutorial vouching places the prestige of the State behind the prosecutor's personal assurances.*" (Emphasis added.) 268 Kan. at 510-11.

Here, not only did the prosecutor inject her personal beliefs about witnesses' credibility into her closing argument, she also explicitly placed the full weight of the State of Kansas behind her position. Specifically, during closing argument, the prosecutor commented:

"*The State believes* that what happened to [J.M.] wasn't because of a bad divorce. What happened to [J.M.] is because the defendant couldn't get to her mom, and

the worse way he could hurt her was to hurt her child. There's a lot of testimony." (Emphasis added.)

The prosecutor in this case sought to elevate her position in the eyes of the jury by calling on the State of Kansas in her closing argument. Even more egregious than the prosecutor's personal insinuations in *Pabst*, the prosecutor in this case explicitly told the jury what "[t]he State believes . . . ." The prosecutor improperly vouched for the State by placing the power and prestige of the State of Kansas behind her personal beliefs on matters outside the evidence.

### Referring to matters not in evidence

The prosecutor also improperly referred to matters not in evidence when she stated:

"The truth is no one really focused on the first incident. I don't know. Maybe it was *because the adults said, yeah, it happened.* I mean, he was there. He was drunk, and he did go in the room. [J.M.'s mother] says, 'Yeah, he pulled her pants down and tried to kiss her', and they talked to her about it. So no one focused on that one. It was all the other incidents they focused on." (Emphasis added.)

The prosecutor stated that the reason why there was little investigation in the first charge was because "the adults said, yeah, it happened." With this statement, the prosecutor insinuated that Morris had admitted to abusing J.M. in the first charge. Nevertheless, Morris never testified that "it happened." He denied that he had sexually touched J.M. Moreover, the prosecutor's statement (*"because the adults said, yeah, it happened"*) vouched for the State's lack of investigation concerning the first charge. This was clearly improper based on our earlier discussion.

### Vouching for credibility of State's witness

Further, the prosecutor improperly vouched for J.M.'s credibility when she made the following argument:

"What we know is this, [J.M.] has expressed to her therapist that she's mad because she doesn't get to see her dad [Morris]. *Well, she could cure that by lying or made this story up.* All she would of had to say, 'I was telling a story. I was making it all up'. She hasn't done that. *She hasn't done it because she wants dad to get some help.*" (Emphasis added.)

Here, the prosecutor asserts that J.M. is mad because she does not get to see Morris anymore. The prosecutor further insinuates that J.M. could once again see Morris if she would have said that she had lied about the four incidents. Nevertheless, the prosecutor interjects her own personal opinion that J.M.'s testimony was truthful because she wants her dad to get help.

Again, the prosecutor puts herself in the position as an unsworn witness. *United States v. Garza,* 608 F.2d 659, 662-63 (5th Cir. 1979) (Prosecutor's statements about his personal opinion of veracity of witness were improper.). The prosecutor's comments related to what the jury ultimately had to decide: whether J.M.'s testimony was more credible than Morris' testimony. By vouching for the credibility of J.M., the prosecutor improperly and prejudicially attempted to introduce evidence on the ultimate issue in this case. See *Pabst,* 268 Kan. at 509.

### Solicitation of Morris' opinion on J.M.'s credibility

During Morris' cross-examination, the prosecutor asked Morris why J.M. had made the accusations against him.

"Q. [Prosecutor:] [Morris], *why would [J.M.] say these things about you?* You have been described by [J.M.'s mother] even that prior to her hearing that this child thought that you were the perfect dad. *Why would she say these things about you if they didn't happen?*

"A. [Morris:] That's what I'm trying to figure out still to this day." (Emphasis added).

It was improper for the prosecutor to ask Morris to comment on the credibility of his accuser.

Whether a district court improperly allows one witness to express an opinion on the credibility of another witness is a question of law subject to de novo review. See *State v. Drayton,* 285 Kan. 689, 701-02, 175 P.3d 861 (2008); *State v. Oliver,* 280 Kan. 681, 695, 124 P.3d 493 (2005).

Our courts have long held that "[q]uestions which compel a defendant or witness to comment on the credibility of another witness are improper" because weighing the credibility of witnesses "is the

province of the jury." *State v. Manning*, 270 Kan. 674, 698, 19 P.3d 84 (2001). As our Supreme Court recently explained, "an even more basic rationale for prohibiting a question which invites the witness to comment on the truthfulness of another witness is that such a question is argumentative and seeks information beyond the witness' competence. [Citation omitted.]" *State v. Crum*, 286 Kan. 145, 152, 184 P.3d 222 (2008).

The State suggests its question was proper because it did not ask the question to bolster J.M.'s credibility; but rather, it asked the question and argued as it did in closing to show *why* J.M. told what happened. This is a distinction without difference. In a nutshell, this case involved a credibility battle. The State's question of Morris and its comment in closing were designed to bolster J.M.'s credibility. The State, however, points out that it did not ask Morris whether he thought J.M. was *lying*, as was the case in *Manning*. See 270 Kan. at 698-71. Moreover, the State notes that, unlike in *Manning*, it did not repeatedly ask Morris to testify on the veracity of the testifying witness. Nevertheless, the prosecutor's questions and argument about Morris' assessment of J.M.'s credibility were improper.

In addition, the prosecutor's question was argumentative: An "examiner is not permitted to ask questions which tend to pose inferences or interpretations from facts and have the witness respond to them nor may questions be asked which are framed to focus the witness to reconcile other testimony with his own. *Undue* embarrassment is improper." 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence, § 9.3, p. 295 (5th ed. 2007). Judge Barbara gives two examples of an argumentative question: "(1) Q. 'Are you telling the jury that witness ____ is lying?' [and] (2) Q. 'How can you reconcile the two statements?' (in a situation where the two statements are clearly irreconcilable)." 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence, § 9.3, p. 296. The prosecutor's question would clearly fits under example (2): How could Morris reconcile J.M.'s testimony about what she said he had done with his testimony about what he said he did

not do? The prosecutor's question was argumentative, and it was meant to cause undue embarrassment to Morris.

*Buttressing the credibility of a State's witness*

Next, during the State's closing argument, the prosecutor used the previous improper question and Morris' answer to discuss and bolster J.M.'s credibility:

"[Prosecutor:] *Even the defendant can tell you he doesn't know why* [J.M.] *would say these things.* He thinks they had a pretty good relationship, but she has said them. *She said them because she thinks her father is getting help now and it's okay to say it now. She knows that no one can come and take her away from her mom,* and *that's what she was worried about. There's no reason why* [J.M.] *would make these things up unless they happened.*" (Emphasis added.)

Here, the prosecutor's remarks bolstered J.M.'s credibility. The prosecutor's argument was based on a classic non sequitur: Morris does not know why J.M. would say that he abused her; therefore, J.M.'s assertions about the sexual abuse must have happened. The reconstruction of the assumed major premise in the prosecutor's argument shows what nonsense on which the deduction is based: All people who are unable to explain why an accuser would say negative things about them must have done what the accuser claimed they did. The assumed major premise ignores the possibility of a false accusation.

In addition, this argument improperly asked the jury to speculate on matters outside the record. Similarly, quoting *State v. Kleypas*, 272 Kan. 894, Syl. ¶ 83, 40 P.3d 139 (2001), this court in *State v. Jeffrey*, 31 Kan. App. 2d 873, 881, 78 P.3d 284 (2003), stated:

" '[P]rosecutorial comments referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence. It is improper for a prosecutor to create an "imaginary script" in order to create and arouse the prejudice and passion of the sentencing jury.' "

It is well established that the fundamental rule in closing arguments is that a prosecutor must confine his or her comments to matters in evidence. When the prosecutor argues facts that are not in evidence, misconduct occurs, and the first prong of the test for prosecutorial misconduct has been met. *State v. Murray*, 285 Kan. 503, 512, 174 P.3d 407 (2008). In addition, when a prosecutor

refers to facts not in evidence, such statements tend to make the prosecutor his or her own witness who offers unsworn testimony not subject to cross-examination. See *Pabst,* 268 Kan. at 510; *People v. Hill,* 17 Cal. 4th 800, 828, 72 Cal. Rptr. 2d 656, 952 P.2d 673 (1998). This unsworn testimony, " ' "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." ' [Citations omitted.]" 17 Cal. 4th at 828.

Here, by giving the jury an "imaginary script" of what J.M. was thinking, the prosecutor asked the jury to speculate on facts that were not admitted into evidence at trial. In doing so, the prosecutor improperly put herself in the position of an unsworn witness who was not subject to cross-examination.

## Appealing to passion and prejudice of the jury

Finally, interjecting her own opinion and belief as she ended her rebuttal argument, the prosecutor stated:

> "They [Morris and his counsel] can't tell you why [J.M.] would tell, would say these things, but I can tell you why she disclosed them. She disclosed them because it was safe to do so now because dad was in therapy. *He was getting help with his head, and he told her if she told before then that's when it would be bad.* Dad was getting help. She was safe with her mom. She didn't have to see Cathy again, that's why she told. . . .
>
> *"The verdict here is guilty."* (Emphasis added.)

As stated earlier, the prosecutor's comments referring to what J.M. was thinking were improper because the comments asked the jury to speculate on facts not in evidence. *Jeffrey,* 31 Kan. App. 2d at 881. Indeed, the State concedes in its brief that what prompted J.M. to disclose the alleged abuse was only the State's theory: "The [S]tate's theory was that [J.M.] disclosed when she did because she had been told that her father was getting help." The evidence, however, does not support this theory.

Moreover, the comments were designed to appeal to the passion and prejudice of the jury. Indeed, the prosecutor's opinion about why J.M. felt safe to report the alleged incidents of abuse is contradicted by J.M.'s testimony. The prosecutor's closing argument insinuates that Morris had told J.M. that things would be bad for

J.M. if she told anyone about the alleged abuse before he had entered therapy. During the prosecutor's direct examination of J.M., the prosecutor asked J.M. the following question:

"Q. [J.M.], did you ever tell your mom what happened?

"A. Yes, cause she picked me up . . . and we came up to Olathe . . . . I told her all the parts that he touched and all the times that he did it to me.

"Q. And that was not too long ago, huh?

"A. Nope.

"Q. Okay. Had you told her before then?

"A. No.

"Q. Okay. Did the defendant ever tell you—Did your dad ever tell you not to tell?

"A. Well, he told me not to tell anybody when we were on the gravel road. He told me not to tell anybody or else I will have to live out with Cathy, the mean girl.

. . . .

"Q. Did your dad tell you that your mom would go to jail if you told?

"[Defense Counsel:] Objection, leading.

"A. No.

"THE COURT: Is the mom going to testify?

"[Prosecutor:] Yes.

"THE COURT: I'll overrule it.

"Q. Do you remember, [J.M.], if your dad ever told you that your mom would go to jail if you told?

"A. He did not say that.

"Q. You don't remember, or he didn't.

"A. He did not say it."

Nowhere in J.M.'s testimony does she state that Morris told her to keep the alleged abuse secret until he had entered therapy. The prosecutor created an "imaginary script" to arouse the passion and prejudice of the jury. *Kleypas*, 272 Kan. 894, Syl. ¶ 83.

Having established that the prosecutor's arguments were improper, it is necessary to consider whether this misconduct constituted plain error; that is, whether the misconduct was so prejudicial that it denied Morris a fair trial. See *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

As the statement of facts of this case indicates, the prime issue was credibility. The prosecutor's examination questions to witnesses and comments were improper and, at the very least, interjected her personal belief that J.M.'s testimony was more truthful

than Morris' testimony. Moreover, the prosecutor's questions and comments exposed the jury to several fact-free personal opinions. Clearly, the prosecutor's expression of her personal opinions were improper and were damaging to the defense. In addition, the jury was allowed to believe that the prosecutor's improprieties were proper because the trial court never intervened to correct any of them. Indeed, the trial court gave no curative instructions. See *Pabst,* 268 Kan. at 507 ("Both the prosecutor and the trial judge have a responsibility to ensure the closing argument is kept within the proper bounds."). Finally, the general instructions given to the jury at the close of the case were insufficient to reduce the prejudice of the prosecutor's questions and comments. We determine that the prosecutor's misconduct was gross and flagrant.

Under the second factor, ill will was shown when the prosecutor knew, or should have known, that she was violating rules of prosecutorial conduct by: (1) stating her opinion on the credibility of witnesses; (2) suggesting to the jury that it should abandon its common sense; (3) expressing her personal belief on matters outside the evidence; (4) vouching for the State of Kansas; (5) referring to matters outside the evidence; (6) vouching for the credibility of J.M.; (7) soliciting testimony from Morris on J.M.'s credibility; (8) buttressing the credibility of J.M.; and (9) appealing to the passion and prejudice of the jury. See *State v. McHenry,* 276 Kan. 513, 525, 78 P.3d 403 (2003) (A prosecutor's repeated acts of misconduct are "evidence of ill will.").

Finally, we turn our attention to the third factor. With the exception of J.M.'s testimony, there was no direct evidence that Morris had molested J.M. Moreover, the State concedes in its brief that the evidence against Morris was not overwhelming. The prosecutor's improper questions and comments, as stated earlier, called the jurors' attention to matters that would not have been proper for them to consider in arriving at their verdict. The possible effect that these improper and very prejudicial questions and comments had on the jury's consideration of Morris' credibility and the verdict is unknown. As a result, we cannot declare beyond a reasonable doubt that the errors were harmless in that they had little, if any, likelihood of having contributed to the verdict. *State v. Thompkins,*

271 Kan. 324, 335, 21 P.3d 997 (2001); *State v. Bell*, 266 Kan. 896, 920, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999). For these reasons, we reverse and remand for a new trial.

Moreover, our determination to reverse for a new trial is reinforced by the prosecutor's violation of the order in limine limiting Spaniol's testimony to that of a lay witness.

### Cumulative error

Morris argues that cumulative error denied him a fair trial. Nevertheless, we have already determined that there were reversible errors in this case. The errors were prejudicial and denied Morris a fair trial.

Citing *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), Morris also contends that the trial court erred in including his prior convictions in his criminal history. In addition, Morris asserts that the trial court erred in requiring him to reimburse the Board of Indigents' Defense Services (BIDS) for his court-appointed attorney fees. Because we are reversing, we need not consider Morris' challenge to his criminal history or BIDS' attorney fees.

Finally, our reversal of the convictions renders Morris' argument that the trial court abused its discretion in denying his request for continuance moot.

Reversed and remanded for a new trial.