No. 109,350

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMIE G. MARSHALL,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate review of an allegation of prosecutorial misconduct involving improper closing arguments requires a two-step analysis. First, an appellate court must determine whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial.

2.

A prosecutor may not state a personal opinion regarding the ultimate guilt or innocence of a defendant. A prosecutor may state that the defendant committed the crime when such a statement is accompanied by language directing the jury to consider the evidence supporting the State's charge, thus rendering the prosecutor's statement merely directional and not an expression of the prosecutor's personal opinion.

1

3.

A prosecutor may not impeach a defendant's credibility at trial by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. A prosecutor may, however, impeach a defendant's credibility at trial by introducing evidence of the defendant's prior statements made prearrest, or made postarrest to fellow jailhouse inmates, when those statements are inconsistent with the defendant's trial testimony.

4.

In closing arguments a prosecutor must confine his or her comments to matters in evidence. It is improper for a prosecutor to speculate as to the internal thought processes of witnesses. However, prosecutors are given wide latitude to craft arguments that include inferences that can reasonably be drawn from the evidence.

5.

The requirement that facts increasing the maximum penalty for a crime be charged in an indictment only applies in federal cases, as the Fifth Amendment's grand jury provision does not apply to the states through the Fourteenth Amendment.

6.

The notice requirement for state criminal cases is found in the Sixth Amendment to the United States Constitution. The Sixth Amendment requires that the defendant be given notice of the accusations against him or her and an opportunity to respond to them. Such notice must be sufficient to make the opportunity useful.

7.

K.S.A. 2013 Supp. 21-6817(b)(1) requires the State to provide notice that it intends to seek an upward sentencing departure and to provide information to the court

regarding the alleged fact or factors that may increase the penalty no less than 30 days prior to trial, or 7 days from the arraignment if the trial is to take place in less than 30 days. These notice provisions are sufficient to satisfy the requirements of the Sixth Amendment.

8.

A defendant's criminal history need not be proven beyond a reasonable doubt to a jury.

Appeal from Johnson District Court; JOHN P. BENNETT, judge. Opinion filed September 5, 2014. Affirmed.

*Samuel Schirer*, of Kansas Appellate Defender Office, of Topeka, for appellant.

*Steven J. Obermeier*, deputy district attorney, Stephen M. Howe, district attorney, and *Derek Schmidt,* attorney general, for appellee.

Before BUSER, P.J., STEGALL, J., and BUKATY, SJ.

STEGALL, J.:  Jamie Marshall was convicted of raping A.M., a developmentally disabled adult under his care. The State alleged and the jury found a fiduciary relationship between Marshall and A.M. and, as such, Marshall received an enhanced sentence. This is Marshall's direct appeal claiming:  (1) the State committed reversible misconduct during closing arguments; (2) he was denied his due process rights under the Fifth and Sixth Amendments because the State did not allege the aggravating factor of a fiduciary relationship in the criminal complaint; and (3) an *Apprendi* violation. Because we find that no reversible error occurred below, we affirm.

3

A.M. is a developmentally disabled adult with moderate mental retardation. Because of her disabilities, A.M. is not able to live independently. In February 2012, she was living in Caring Hands, a facility that provides care and supervision in a residential setting. On January 28, 2012, A.M. developed a skin rash on her upper inner thigh as a result of an antibiotic she had been taking. A yellow tinted medical cream was being used by Caring Hands to treat the rash. By February 28, 2012, the rash had cleared.

Jamie Marshall was one of the Caring Hands employees charged with A.M.'s care during this time. His job duties entailed transporting the residents to day activities and supervising them in the evening hours, occasionally staying overnight. On the afternoon of February 28, 2012, Marshall arrived to work at the Caring Hands residence where A.M. and two other Caring Hands residents lived. Also staffing the residence that afternoon was Caring Hands employee Emma White. About 5:30 p.m., White left Marshall alone with A.M. and the other two residents in order to attend a work training event.

During the morning hours of February 28, Marshall had been engaged in a drawn out argument with his girlfriend, Lindsey Misner, with whom he had a child. Marshall and Misner lived together in an apartment near A.M.'s Caring Hands residence. After White left the Caring Hands residence, Marshall loaded all three of the Caring Hands residents into the Caring Hands van and drove to his apartment to continue his domestic dispute with Misner. Marshall and the residents returned to the Caring Hands residence at about 6 p.m. that evening.

Marshall and the State presented very different versions of what happened next. According to Marshall, after bringing A.M. and the other residents back to the Caring Hands facility, he stepped outside to call Misner. When he went back inside he found

A.M. sitting on the corner of her bed with her pants pulled down below her waist. When Marshall told her to pull her pants up, A.M. responded, "It hurts," and pointed to her genitals. Marshall testified that he was aware of A.M.'s rash and assumed that the rash was causing A.M. discomfort. Marshall then called White and asked when she planned to be back at the Caring Hands residence. According to Marshall, he discussed applying medication to A.M.'s rash; however, White testified that the only subject of the call was how much longer she was going to be away from the residence. Marshall testified that after the call with White he went to the medicine cabinet, retrieved the rash medication, and applied it to A.M.'s "legs and all over the top of her vagina." Marshall testified that after he applied the medication, A.M. gave him a hug and said thank you.

A.M. also testified at trial. In her testimony, she said, "[H]e poked me in my private area . . . [w]ith the poker." A.M. testified that Marshall used a pink lotion, not the yellow tinted cream, and that when Marshall touched her it made her feel sad. A.M. then clarified that Marshall poked her on the inside of her body. A cup and pen were used to demonstrate the difference between inside and outside due to A.M.'s significant verbal and conceptual disabilities.

Following the incident, Marshall again drove to his apartment in the Caring Hands van. This time, he took only A.M. with him, leaving the other two residents unattended. Misner testified that when he arrived, Marshall was acting agitated and angry and began to demand money. At this time, a friend of Misner's was present in the apartment. Misner's friend became concerned due to the escalating nature of the argument and called the police, at which point Marshall left the apartment. During this time, A.M. never left the van.

Soon thereafter, Marshall arrived with A.M. back at the Caring Hands residence. In the meantime, another Caring Hands employee, Amanda Mathews, had come to the residence. Mathews testified that after dropping A.M. off, Marshall told her he had an

5

emergency and left in a rush. Marshall then returned to his apartment. On arriving, Marshall found Officer Jason Goddard at the scene in response to the domestic disturbance call. Goddard testified that Marshall and Misner were arguing over money in a savings account that Marshall felt was his. Marshall stated that he needed the money for gas. Marshall was eventually allowed to leave the apartment.

Back at the Caring Hands residence, Mathews noticed that A.M. was wearing pajama pants when Marshall dropped her off, which struck Mathews as unusual. Similarly, prior to A.M.'s return, Mathews had noticed that A.M.'s service dog was at the residence without A.M, which was also unusual. Later that evening, while A.M. was in the restroom, she began to call for Mathews. Mathews asked A.M. what was wrong, and A.M. said that she was hurt and pointed to her genitals. Mathews asked why she was hurting, and A.M. responded, "Jamie, Jamie," and began to cry. Mathews then took A.M. to the hospital.

At the hospital, Officer Brandon Faber responded to the reported rape. Faber testified that he spoke to A.M. at the hospital and she told him that a person named Jamie put too much lotion on her genitals and hurt her. Jennifer Johnson, the program coordinator for the Forensic Assessment Consultation and Treatment Program, testified that she examined A.M. on February 28, 2012. Johnson testified that A.M. told her that Marshall had smeared lotion on her, hurt her, and she was upset that Marshall had not apologized for hurting her. A.M. told Johnson that Marshall was the one who took her pants off. Johnson's examination of A.M. revealed a fresh laceration on A.M.'s fossa navicularis, an injury that was consistent with penetration of the vagina. Johnson collected DNA swabs and A.M.'s clothing for DNA testing.

The next day Jennifer Coughlin, a forensic interviewer employed by Sunflower House, spoke to A.M. During that interview A.M. told Coughlin that Marshall had put too much lotion on A.M. with his hands, that it hurt, that it made her real sad, and that he

6

did not say he was sorry. A.M. stated that Marshall had used a pink lotion, that Marshall had touched her inside her body, and that she had asked Marshall to stop.

Meanwhile, after leaving his apartment following the domestic disturbance call, Marshall went to his uncle's home in Overland Park, Kansas, where he stayed the night. Marshall testified that around midnight he received a call from the director of Caring Hands to inform him that there were suspicions that Marshall had raped A.M. The next morning, Marshall left his uncle's house and drove to his mother's home in Connecticut. According to Marshall, he had a previously arranged visit to Connecticut planned and he wanted to take his car to his mother's house so Misner could not sell it. However, Marshall told Misner that he was headed west, telling her at various times that he was going to Salina and Arizona.

Marshall eluded law enforcement for 2 weeks. He was eventually tracked down in Connecticut, arrested, and transported back to Kansas in the middle of March. While he was in jail in Johnson County, Marshall met and talked with fellow inmate Jeremy Valadez. Valadez testified that Marshall had admitted, over the course of several conversations, that Marshall had used his fingers to penetrate A.M. Valadez testified that Marshall said he fled to Connecticut because of the charges against him and never said anything about treating A.M.'s rash with medical ointment.

Additional evidence presented by the State included DNA evidence showing that Marshall's DNA matched the profile of the DNA on genital swabs taken from A.M. on the night of February 28 and recordings of phone conversations Marshall had with Misner while he was in jail indicating that he drove to Connecticut because he was confused and he wanted to get away.

The jury convicted Marshall of one count of rape and returned a unanimous finding that there had been a fiduciary relationship between Marshall and A.M. at the

7

time of the rape. At sentencing, the State's upward departure motion (which had been filed prior to trial alleging the fiduciary relationship) was granted and Marshall was sentenced to 300 months in prison.

Marshall timely appeals.

## PROSECUTORIAL MISCONDUCT

Appellate review of an allegation of prosecutorial misconduct involving improper closing arguments requires a two-step analysis. First, we must determine whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, we must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012).

Marshall alleges four different categories of misconduct in the prosecutor's closing argument. He claims that the prosecutor: (1) gave her personal opinion of Marshall's guilt; (2) improperly commented on Marshall's postarrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d. 91 (1976); (3) inflamed the passions of the jury; and (4) crafted a speculative narrative of the events that included facts not in evidence. We will examine each of these claims in turn.

*Personal Opinion of Guilt*

"Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant." *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006). Marshall contends that the prosecutor twice gave her personal opinion of Marshall's guilt. First, at the conclusion of her closing argument when she stated: "Ladies and Gentlemen,

8

something happened on February 28th of 2012; and that something was rape." Second, when she wrapped up the rebuttal portion of closing arguments by again saying: "Jamie Marshall raped [A.M.] That's the something that happened."

Marshall relies on *State v. Peppers*, 294 Kan. 377, 276 P.3d 148 (2012). In *Peppers*, the following comment in closing was deemed to fall outside the wide latitude afforded a prosecutor when discussing the evidence: "I'm going to ask that you find this defendant, Antwan Peppers, guilty of murder in the first degree and guilty of attempted murder in the first degree. Why? Because he did it." 294 Kan. at 399. Our Supreme Court held that while a prosecutor is permitted to state that the defendant committed the crime, such statements must be accompanied by language directing the jury to consider the evidence supporting the State's charge. This context renders such statements "merely directional and not an expression of the prosecutor's personal opinion." 294 Kan. at 399-400.

The State argues that the prosecutor's statements in this case were so couched in a discussion of the evidence as to have been merely directional. The State points to *State v. Bennington*, 293 Kan. 503, 264 P.3d 440 (2011), as an analogous case. There, the prosecutor made the following argument: "I want to stand here right now and ask you, don't find him guilty of attempted rape. Find him guilty of rape. That's what he did." 293 Kan. at 530. The *Bennington* court held:

> "Viewed in isolation, 'That's what he did,' sounds like a personal opinion. But when placed in context, this statement is not outside the wide latitude allowed attorneys during argument. The statement was made during the prosecutor's explanation of the elements of attempted rape. . . .
>
> ". . . A review of the entire statement shows that the prosecutor was accurately describing the evidence and relating it to the elements of attempted rape versus rape, and the statement, 'That's what he did,' was relating the facts to those elements. A prosecutor

9

has wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence." 293 Kan. at 530-31.

During one of the recorded phone conversations between Marshall and Misner that was played to the jury, Misner can be heard telling Marshall that "something happened" on the night of February 28. The prosecutor drew the motif of her closing argument from Misner's statement. She began by saying, "Something happened, something happened on February 28th of 2012." The prosecutor proceeded to thoroughly argue the evidence in support of the State's charge, including A.M.'s statements; the physical evidence, including DNA evidence; Valadez's testimony regarding Marshall's incriminating statements; and the evidence undermining Marshall's version of events. The prosecutor further correctly stated and clearly explained the State's burden of proof and the elements of the crime. At the conclusion of this recitation, the prosecutor echoed her earlier statement by saying, "Ladies and Gentlemen, something happened on February 28th of 2012, and that something was rape."

The statements Marshall claims were impermissible prosecutorial expressions of personal belief were sufficiently couched in a discussion of the evidence to be merely directional. As such, they do not fall outside the wide latitude a prosecutor is afforded to craft arguments drawn from the evidence.

*The Alleged* Doyle *Violation*

Marshall next argues that the State committed a *Doyle* violation by allegedly arguing guilt based on his postarrest silence.

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers

10

but instead invoked his or her constitutional right to remain silent." *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998).

Marshall points to the following passage in the State's closing argument:

"First, the defendant tries to tell [Valadez] this is some big conspiracy, Caring Hands owes me money, they're making all this up. Then he says, State ain't got no evidence, there wasn't enough penetration. . . . He gets more comfortable [with] Mr. Valadez and eventually says, 'I used my hands. I used my hands.'

". . . The defendant never mentioned anything about a medically necessary procedure that he had to perform on [A.M.]. In fact, the defendant doesn't mention that to anyone. That doesn't arise until after all of the police reports are in and the DNA testing is complete. Then he realizes, uh-oh, DNA is back. The State does have evidence."

Rather than a comment on Marshall's silence, it is apparent that here the State is using the incriminating statements made to Valadez to impeach Marshall's claim that he performed a medically necessary procedure on A.M. Both versions of the events cannot be true. Drawing the jury's attention to this fact is not a *Doyle* violation.  When a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown v. U.S.*, 356 U.S. 148, 154, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958).

Likewise, *Doyle* does not prohibit a prosecutor from impeaching a defendant at trial based on his or her prearrest silence. *State v. Tully*, 293 Kan. 176, 188, 262 P.3d 314 (2011). The State had elicited testimony from Marshall that when he spoke to the director of Caring Hands and other Caring Hands employees following the incident, he did not claim to any of them that he had merely applied medical cream to A.M.'s rash. These conversations occurred prior to Marshall's arrest. The context makes it clear that these are

11

the conversations the State was referring to when the prosecutor said, "[T]he defendant doesn't mention that to anyone." The State did not commit a *Doyle* violation.

*Inflaming the Passions of the Jury*

Marshall next contends the State improperly inflamed the passions of the jury when the prosecutor argued that Marshall "hurt [A.M.] and he didn't say, 'I'm sorry.' [A.M.] lets him know she's upset, she's really upset." Marshall acknowledges that A.M. did indicate that she was upset that Marshall did not apologize for hurting her. Marshall argues, however, that the only possible reason for the State to draw the jury's attention to this piece of evidence was to elicit sympathy for A.M. and outrage toward Marshall. We are not convinced.

Rather, the prosecutor was reciting a statement directly from the evidence which demonstrated that A.M., a developmentally disabled adult with limited articulation capacity, was genuinely upset and disturbed by what had happened to her—important evidence for the jury to consider. Further, the prosecutor highlighted this portion of the trial testimony to draw the inference that A.M.'s disturbed emotional state triggered Marshall's ultimate efforts to flee the state—again, a permissible inference from the evidence. The State did not inflame the passions of the jury.

*Creating a Speculative Narrative Lacking Evidentiary Basis*

For his last claim of misconduct, Marshall contends that the State impermissibly created a speculative narrative lacking an evidentiary basis. Marshall cites to the following portions of the prosecutor's closing argument:

12

"The defendant got [A.M.] alone in her room where it's just him and [A.M.], the developmentally disabled girl who he doesn't believe will ever be able to articulate what happened.

"He gets her on her bed. He gets pink lotion, . . . not this medicated cream that was used to treat the rash weeks earlier. He gets pink lotion. He uses it as a lubricant and he penetrates [A.M.]'s genitals. Unexpectedly, [A.M.] tells him to stop. He didn't stop, though, he continued to do it. He penetrated her genitals causing an injury. You saw that injury in the State's exhibits. He hurt [A.M.] and he didn't say, 'I'm sorry.'

"[A.M.] lets him know she's upset, she's really upset. And he realizes that [A.M.] is going to be able to say what happened. So what does the defendant do? He calls Emma [White]. He needs to figure out when the other caretakers are getting back. You heard Ms. White's testimony, he called me and said what time are we going to get back. When he gets an iffy response from Miss White, I don't know when we'll be back, he realizes he can't risk leaving [A.M.] there while he gets money to get out of town. He can't risk that.
. . . .

". . . There are certainly a lot of things that we all would like to know. What exactly did he poke you with? Can't get that out of her. His poker. Can't get that out of her because she didn't see it."

Marshall argues that the prosecutor improperly argued facts not in evidence by creating an "imaginary script" describing both Marshall's thoughts and what A.M. didn't see.

In closing arguments a prosecutor must confine his or her comments to matters in evidence. *State v. Morris*, 40 Kan. App. 2d 769, 791, 196 P.3d 422 (2008). In *Morris*, this court held that it is improper for a prosecutor to speculate as to the internal thought processes of witnesses. *Morris*, 40 Kan. App. 2d at 791. However, prosecutors are given wide latitude to craft arguments that include inferences that can reasonably be drawn from the evidence. *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). In this

instance, the prosecutor's comments fall into this latter category of reasonable inferences drawn from the evidence.

There was substantial testimony presented at trial regarding A.M.'s verbal deficiencies. Vocabulary testing placed her in the first percentile. Marshall admitted that he was aware of A.M.'s serious disabilities. The prosecutor's comment that Marshall "doesn't believe [A.M.] will ever be able to articulate what happened" was a reasonable inference drawn from the evidence. The State's further argument that after A.M. became upset, Marshall "realizes that [A.M.] is going to be able to say what happened" and thus he "realizes he can't risk leaving [A.M.] there while he gets money to get out of town" is also a reasonable inference drawn from the evidence. White testified that Marshall's only reason for his call to her following the rape was to find out what time she would return. Misner testified that Marshall did not ask for money until after the rape had occurred. Given Marshall's knowledge of A.M.'s serious disabilities, her articulation of distress following the rape, and Marshall's conversations with White and Misner, it is reasonable to infer that Marshall took A.M. with him to his apartment in order to prevent A.M. from making any disclosures until after Marshall had an opportunity to flee the state.

Likewise, there was substantial evidence that Marshall utilized pink lotion during the act of digital penetration. The prosecutor's statement—that Marshall "gets pink lotion, . . . not this medicated cream that was used to treat the rash weeks earlier . . . [and] [h]e uses it as a lubricant and he penetrates [A.M.]'s genitals"—was again a reasonable inference drawn from the evidence.

Finally, Marshall objects to the State's statement that A.M. "didn't see" what Marshall "poked" her with. A.M. was asked at trial about what was used to "poke" her. She answered "a poker" but could not articulate further. A.M. testified that she was lying down and Marshall was standing up in front of her when the penetration occurred. The State's argument came during rebuttal after Marshall's counsel had argued in his closing

14

that A.M. had been coached and was not credible, in part because she could not articulate what Marshall had "poked" her with. "Prosecutors have wide latitude . . . to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses." *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009). Immediately after the portion of the State's argument Marshall objects to, the prosecutor concluded: "When you look at [A.M.], you have to think, would a 5-year-old child relay what happened to them? How would they be able to describe this? He poked her." Given A.M.'s verbal deficiencies, given her position lying down while Marshall stood over her, and given the defense efforts to undermine A.M.'s credibility, the prosecutor's rehabilitation of A.M.'s testimony was limited to reasonable inferences drawn from the evidence and was not outside the wide latitude afforded the State in closing arguments.

Because we find that none of the alleged instances of misconduct falls outside the wide latitude afforded the State when discussing the evidence, we need not conduct a plain error analysis. The State did not commit reversible misconduct during its closing arguments.

### FAILURE TO ALLEGE AGGRAVATING FACTOR IN COMPLAINT

Next, Marshall argues that his due process rights were violated when his sentence was increased due to an aggravating factor not alleged in the criminal complaint against him. We apply a de novo standard of review to constitutional questions. *State v. Kirtdoll*, 281 Kan. 1138, 1151, 136 P.3d 417 (2006).

Kansas law permits the State to file a motion for an upward departure after a criminal complaint is filed:

15

"(b)(1) Upon motion of the county or district attorney to seek an upward durational departure sentence, the court shall consider imposition of such upward durational departure sentence in the manner provided in subsection (b)(2). The county or district attorney shall file such motion to seek an upward durational departure sentence not less than 30 days prior to the date of trial or if the trial date is to take place in less than 30 days then within seven days from the date of the arraignment.

"(2) The court shall determine if the presentation of any evidence regarding the alleged fact or factors that may increase the penalty for a crime beyond the statutory maximum, other than a prior conviction, shall be presented to a jury and proved beyond a reasonable doubt during the trial of the matter or whether such evidence should be submitted to the jury in a separate departure sentencing hearing following the determination of the defendant's innocence or guilt." K.S.A. 2013 Supp. 21-6817(b)(1) and (2).

Here, the State followed this procedure and filed a motion putting Marshall on notice that it intended to seek an upward departure on the grounds that the "offense involved a fiduciary relationship which existed between the defendant and the victim." The motion was filed nearly 5 months prior to trial. The alleged aggravating factor was submitted to the jury and found beyond a reasonable doubt, resulting in the enhanced sentence imposed on Marshall by the district court.

Marshall argues that despite the State's compliance with the provisions of the Kansas Criminal Code, the notice he received was nonetheless constitutionally deficient. Marshall stakes his argument on United States Supreme Court decisions holding that any aggravating factor subjecting the defendant to an enhanced sentence must be charged in the indictment and proved to a jury beyond a reasonable doubt. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d. 311 (1999).

16

Whether the notice requirements of K.S.A. 2013 Supp. 21-6817(b)(1) satisfy constitutional due process presents a question of first impression to this court. We are guided, however, by our Supreme Court's decision in *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), a case with facts directly analogous to those in front of us. The State had charged Scott with capital murder and subsequently provided notice of intent to seek the death penalty based on certain aggravating factors.

"Scott contends the notice provisions provided for in K.S.A. 21-4624(a) are unconstitutional because they do not require the State to specify the aggravating factors in the information. K.S.A. 21-4624(a) states:

'If a defendant is charged with capital murder, the county or district attorney shall file written notice if such attorney intends, upon conviction of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be sentenced to death. Such notice shall be filed with the court and served on the defendant or the defendant's attorney not later than five days after the time of arraignment. If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of capital murder, shall be sentenced to life without the possibility of parole, and no sentence of death shall be imposed hereunder.'

Scott argues that under *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), aggravating factors, as elements of the offense, must be set forth in the charging document.

"Scott's argument is not persuasive. *Jones* and *Apprendi* both stand for the proposition that, under the grand jury provision of the Fifth Amendment and the notice and jury trial provision of the Sixth Amendment, any fact other than a prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. However, Scott fails to

17

recognize that the requirement that such facts be charged in an indictment only applies in federal cases, as the Fifth Amendment's grand jury provision does not apply to the states through the Fourteenth Amendment. See *Ring v. Arizona*, 536 U.S. at 597 n.4; *Apprendi*, 530 U.S. at 477 n.3; *Hurtado v. California*, 110 U.S. 516, 538, 4 S. Ct. 111, 28 L. Ed. 232 (1884)." *Scott*, 286 Kan. at 101-02.

Marshall asserts the same failed argument made by the defendant in *Scott*. Because the Fifth Amendment's grand jury provision does not apply to Kansas, the only question is whether the notice provisions of K.S.A. 2013 Supp. 21-6817 comport with the Sixth Amendment. "The Sixth Amendment requires only that the defendant be given 'notice and an opportunity to respond.' [Citation omitted]. Such '[n]otice must be sufficient to make the opportunity useful.' [Citation omitted]." *Scott*, 286 Kan. at 102. The *Scott* court concluded that the statutory notice provisions concerning the death penalty—requiring notice that the State intended to seek the death penalty no later than 5 days following arraignment and requiring notice of the specific aggravating factor required prior to sentencing—was sufficient to satisfy the minimum notice requirements of the Sixth Amendment. 286 Kan. at 102.

K.S.A. 2013 Supp. 21-6817(b)(1) requires the State to provide notice that it intends to seek an upward sentencing departure and to provide information to the court regarding "the alleged fact or factors that may increase the penalty" no less than 30 days prior to trial, or 7 days from the arraignment if the trial is to take place in less than 30 days. Applying *Scott*, we are convinced that these notice provisions are sufficient to satisfy the requirements of the Sixth Amendment. The fact that Marshall received actual notice of both the State's intent and the aggravating factor the State would allege nearly 5 months prior to trial serves to illustrate the effectiveness of the Kansas notice provisions. Marshall was not denied his due process rights.

18

Finally, Marshall claims the district court violated his Sixth and Fourteenth Amendment rights as articulated by *Apprendi* when it imposed an increased sentence based on his prior criminal history without requiring the State to prove that criminal history beyond a reasonable doubt to a jury.

The interpretation of a sentencing statute is a question of law. Thus, our standard of review over Marshall's claim is unlimited. See *State v. Jolly*, 291 Kan. 842, 845-46, 249 P.3d 421 (2011). Additionally, the constitutionality of a sentencing statute is a question of law subject to unlimited appellate review. *State v. Riojas*, 288 Kan. 379, 388, 204 P.3d 578 (2009).

Marshall concedes that the Kansas Supreme Court has decided this issue against him. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *review denied* 294 Kan. 946 (2012). There is no indication that the Kansas Supreme Court is departing from its holding in *Ivory*. As such, we conclude the district court did not violate *Apprendi* when it considered Marshall's criminal history without requiring that it be proven beyond a reasonable doubt to a jury.

Affirmed.