NOT DESIGNATED FOR PUBLICATION

No. 120,977

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMIE MARSHALL,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed April 10, 2020. Affirmed.

*Richard P. Klein*, of Olathe, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

PER CURIAM:  A jury convicted Jamie Marshall of rape. He was sentenced to 300 months in prison. Marshall later filed a motion under K.S.A. 60-1507, alleging ineffective assistance of trial counsel. Following an evidentiary hearing, the district court found Marshall's trial counsel to be ineffective but denied his request for a new trial because he had not established prejudice. After reviewing the trial record and the evidentiary hearing on Marshall's 60-1507 motion, we agree. Marshall has failed to establish that he was prejudiced by his trial counsel's ineffective assistance. As a result, we affirm the trial court's ruling.

FACTUAL AND PROCEDURAL HISTORY

In 2012, a jury found Marshall guilty of one count of rape of A.M., a developmentally disabled adult under his care. The jury further found a fiduciary relationship existed between Marshall and the victim. The facts are set out in Marshall's direct appeal, so we will only discuss them as relevant to this action. *State v. Marshall*, 50 Kan. App. 2d 838, 840-43, 334 P.3d 866 (2014). At sentencing, the district court granted the State's motion for upward departure and sentenced Marshall to 300 months in prison.

In July 2016, Marshall filed a timely pro se motion under K.S.A. 60-1507. While the motion contained several allegations, the only one relevant to this appeal is the allegation that Marshall's trial counsel was ineffective for failing to hire an expert on child interviewing techniques to counter the State's forensic interviewer.

The district court appointed counsel to represent Marshall and held an evidentiary hearing on Marshall's claim. The State called Marshall's trial attorney, Michael Page, to testify. Page admitted on direct and cross-examination that he did not consider hiring an expert to evaluate A.M.'s forensic interview.

To support his claim, Marshall called a clinical psychologist named Robert Barnett, an expert in child interviewing techniques, to testify. Barnett testified that the person who interviewed A.M. used elements of the Finding Words or RATAC protocol during the interview. He noted two overarching problems with this protocol: (1) scientists cannot reliably test it because its parameters are too flexible and (2) it has not been peer reviewed. Barnett further testified that in this case the interviewer used several leading and closed-ended questions during the interview, negatively impacting its reliability. He explained that an interviewer should only use open-ended questions so that they can collect more reliable information and avoid coaching witnesses. Barnett also noted that the interviewer explored no alternative hypotheses with A.M. He explained

2

this is a problem because it creates confirmation bias—in other words, the interviewer here essentially communicated to A.M. that A.M. was molested, that she was molested a certain way, and that Marshall was the only person who molested her. Barnett stated the interviewer gave no opportunity for any other possible explanations.

After the parties presented their evidence, the district court found, after viewing the totality of the circumstances, that although trial counsel's performance was deficient for his failure to hire an expert on child interviewing techniques, Marshall was not prejudiced by this deficiency. The district court pointed to several pieces of evidence the parties introduced at trial to support this finding:

- Marshall testified at trial and partially admitted to the conduct alleged in A.M.'s statement: that he rubbed lotion on A.M.'s legs and all over the top of her vagina;
- The laceration found on the lower part of A.M.'s genitalia was an injury consistent with physical penetration of the female sex organ;
- The DNA swabs taken from A.M.'s mons pubis, labia majora, and four-by-four gauze pads used by A.M. to wipe her genitals after voiding her bladder showed that the DNA came from a single male source and were consistent with Marshall's DNA; and
- The jailhouse informant, Jeremy Valadez, testified about how Marshall told him there was "no DNA evidence" and that "there was not enough penetration to make the charges stand."

The district court also noted that Jury Instruction No. 9 defined "[s]exual intercourse" as "any penetration of the female sex organ by a finger, male sex organ, or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." This instruction also indicated that penetration of the vulva or labia can constitute sexual intercourse. The district court found that A.M.'s physical examination

3

established there was penetration of A.M.'s labia minora and the area closest to her vaginal opening and that the DNA evidence and Marshall's admission also supported this finding. Because it found that counsel's deficient performance did not prejudice Marshall's right to a fair trial, the district court denied Marshall's motion. Marshall timely appeals.

ANALYSIS

To prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]). As the district court found that Page was ineffective at trial, the only contested issue on appeal is whether Page's deficient performance prejudiced Marshall.

Because the district court conducted a full evidentiary hearing on Marshall's 60-1507 motion and issued findings of fact and conclusions of law on all issues presented, our task is to determine whether the factual findings related to the prejudice prong of the *Strickland* test are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. See *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). We must give deference to the district court's findings of fact, accepting as true the evidence and any inferences that support or tend to support the district court's findings. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007). We do not reweigh testimony or the credibility of any witnesses when reviewing ineffective assistance of counsel claims. *Mullins v. State*, 30 Kan. App. 2d 711, 716, 46 P.3d 1222 (2002). Our review of the district court's ultimate conclusions of law is de novo. *Adams*, 297 Kan. at 669.

4

To establish prejudice, Marshall must show that a reasonable probability existed that, but for trial counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the trial's outcome. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015). In evaluating whether trial counsel's deficiency prejudiced a defendant, the district court must consider the totality of the evidence before the judge or jury. *State v. Bledsoe*, 283 Kan. 81, 90-91, 150 P.3d 868 (2007). Some errors will have a pervasive effect on the inferences the factfinder draws from the evidence, altering the entire evidentiary picture, while some others will have an isolated, trivial effect. When the record shows overwhelming support for a verdict, it is less likely that any errors at trial affected the verdict. See *Strickland*, 466 U.S. at 695-96.

So we start with a review of the district court's factual findings as to prejudice. The district court found that there was no reasonable probability the jury would have reached a different result absent Page's ineffectiveness—failure to call an expert on interviewing techniques. The district court found that these facts supported a finding that Page's decision did not prejudice Marshall.

- Marshall admitted to rubbing lotion on A.M.'s legs and all over the top of her vagina. There is substantial competent evidence to support this finding based on Marshall's own testimony. In fact, his defense was based on the theory that he was performing an allowed medical procedure—applying medicinal cream. He did not claim that no touching occurred, but implied that A.M. misinterpreted it. It was up to the jury to decide whether to believe him.

  We note there was evidence presented by the State to counter Marshall's claim of an innocent medical procedure. There was evidence that Marshall used pink lotion not yellow medicinal cream. There was evidence presented

5

that A.M. did not appear to have a rash on her upper thighs when she underwent the sexual assault exam. And her mother testified that A.M. had been rash free for 3 weeks before Marshall rubbed the lotion on her. Another aide at A.M.'s apartment also testified the rash had cleared up and that the standard of care was to put on gloves before applying any medicinal cream. Marshall testified that he did not use gloves. Finally, there was evidence presented to the jury that Marshall fled to Connecticut after the incident.

- The district court found that A.M. had a laceration on her genitalia, consistent with physical penetration. There is substantial competent evidence to support this finding based on the testimony of Jennifer Johnson, the nurse who examined A.M. at the hospital.

- The district court found that DNA on A.M's genitals came from a single male source and was consistent with Marshall's DNA. That finding is supported in the record through the testimony of Bethany Stone from the Johnson County crime lab.

- The district court found the jailhouse informant, Jeremy Valadez, to be credible. He testified about how Marshall told him there was "no DNA evidence" and that "there was not enough penetration to make the charges stand" and he "only used his fingers." This finding is supported by Valadez' trial testimony.

The district court also noted that Jury Instruction No. 9 defined "[s]exual intercourse" as "any penetration of the female sex organ by a finger, male sex organ, or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." This instruction also conveyed that penetration of the vulva or labia can constitute sexual intercourse. The district court found that A.M.'s physical examination established there was penetration of A.M.'s labia minora and the area closest to her vaginal opening and that the DNA evidence and Marshall's admission also supported this

6

finding. We would also note that the same jury instruction noted that "[s]exual intercourse does not include penetration of the female sex organ by a finger or object in the course of performance of [generally] recognized health care practices."

In sum, we have no trouble concluding that the findings of fact made by the district court were supported by substantial competent evidence.

We next examine whether these factual findings support the district court's legal conclusion that Marshall has failed to establish prejudice from Page's ineffectiveness. Marshall specifically asserts that the district court, in making its legal findings, improperly reweighed, ignored, and undervalued what the evidence should have been at trial considering Barnett's testimony at the evidentiary hearing. Marshall points to three specific instances in which he argues this occurred: (1) The district court used an incorrect standard in making its decision, (2) the district court over-relied on the DNA evidence and evidence of injury, and (3) the district court's conclusions about Valadez' testimony were unreasonable.

Turning to Marshall's first argument, he contends that the district court used the wrong legal standard in finding no prejudice existed. He states that the district court used the following standard: "'To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" He argues that this standard contradicts *Strickland* and its progeny. But this argument fails because this is the exact standard the district court must use when evaluating the prejudice prong. See *Robertson v. State*, 288 Kan. 217, 225, 201 P.3d 691 (2009) ("To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."). In fact, the record shows that the district court applied this exact standard in making its finding. And Marshall quotes this same standard when discussing the legal requirements for evaluating the prejudice prong. So the district court did not apply the

7

wrong legal standard in evaluating whether Marshall presented sufficient evidence to establish prejudice due to his attorney's ineffectiveness.

Second, Marshall argues that the district court relied too much on the DNA evidence taken from A.M. and the evidence of physical injury on the lower part of A.M.'s genitalia. This argument fails. The record shows that the DNA evidence went largely unchallenged before and at trial. He asserts that the district court relied too much on the DNA evidence at the evidentiary hearing, arguing there is a "good chance" A.M. could have transferred the DNA from her mons pubis and labia majora to her labia minora. But this argument ignores the fact that Marshall has never denied that he applied ointment to A.M.'s genitalia. He does not contest that the DNA found on A.M.'s genitalia came from a single male and was largely consistent with his DNA. He does not contest that DNA largely consistent with his was found, at the very least, on A.M.'s mons pubis and labia majora. Significantly, he does not contest the jury instruction on sexual intercourse given to the jury at trial, which notes that penetration of any part of the labia is sufficient to constitute such an act. This evidence is fatal to Marshall's claim.

Marshall also claims that the district court relied too heavily on the laceration evidence presented at trial. He argues that A.M. could have done it to herself and that it was not a possibility explored during her forensic interview at Sunflower House. While it is true that alternative theories were not explored during A.M.'s interview, this assertion, standing alone, is unlikely to have made a difference in the trial's result when considering all the other physical evidence and witness testimony presented at trial.

Finally, Marshall argues that the district court unreasonably relied on Valadez' testimony. Marshall argues only that it is unreasonable for the district court to assume how much weight the jury gave to Valadez' testimony. Instead, he spends the rest of the brief arguing how testimony from an expert like Barnett would have undermined A.M.'s testimony and credibility at trial. In both instances, Marshall is asking this court to

8

reweigh witness credibility in light of Barnett's testimony at the evidentiary hearing, which this court cannot do.

We have no hesitancy in finding that if Barnett had testified at trial, it is unlikely that his testimony alone would have changed the trial's outcome given the overwhelming evidence presented at trial. It was clear through the testimony of a psychiatrist at trial that A.M. had difficulty understanding and communicating simple concepts. That said, the jury was presented with considerable evidence implicating Marshall in the crime apart from A.M.'s interview at Sunflower House.

Before the interview that undergirds Marshall's claim of ineffectiveness, A.M., started crying and yelling during a trip to the bathroom and told one of the workers at her apartment that her privates were hurting and Jamie hurt them. A.M. told the police officer that arrived at the scene that "she was in her room and a person named Jamie had put lotion on her. And when she said, "'lotion on her' she pointed at her groin area, said put too much lotion on her and it hurt her." She told her mother, "Jamie hurt me." She told the nurse at the hospital that "Jamie had smeared lotion all over her and it had hurt and she was upset that he didn't apologize to her." The examining nurse found a laceration on the inner side of A.M.'s labia majora which she said pointed to recent penetrating blunt force trauma.

At trial, the psychologist, Dr. Mitchell Flesher, testified that A.M. was a 29-year-old female with a diagnosis of moderate mental retardation, an I.Q. of 47, and with meager communication skills and recall. She would have no understanding of sex or sexual intercourse or words to describe it. The jury observed A.M.'s interview at Sunflower House. Jennifer Coughlin, the forensic interviewer, testified that she asked A.M. if Jamie put the lotion on the inside, the outside, or something else and A.M. responded "'in.'" Marshall's attorney cross-examined Coughlin about asking A.M. leading questions and suggesting that Jamie had touched her inside her genitals.

A.M. testified that Jamie poked her inside her private area with a "poker." She said the lotion he put on her was pink and white. A.M.'s mother testified that the medicated cream was yellow. There were several bottles of lotion in A.M.'s bedroom. The police did not seize any tubes of medicinal cream, presumably because there had only been discussion of lotion at that point in time. Three witnesses—A.M.'s mother, a home healthcare worker, and the examining nurse—all testified that A.M. did not have a rash in need of treatment at the time. Marshall admitted that he applied medicinal ointment to A.M.'s genitalia and that he did not wear gloves. Because he admitted touching A.M.'s genitals, it was no surprise that forensic examiners found Marshall's DNA on A.M.'s genitalia. His attorney challenged the differing statistical probabilities related to the DNA found outside A.M.'s labia majora and the partial DNA results found inside her labia minora. He also discussed the possibility that the DNA found could have been transfer DNA.

Valdez, the jail informant, testified that Marshall told him that a girl at the place he worked as a home healthcare worker was accusing him of putting lotion on his hands and fingering her. He protested that he just used his fingers and there wasn't enough penetration. But more telling is that Marshall never mentioned to Valdez that he was really just applying medicinal cream. Nor did he mention the use of medicinal cream to anyone else after he was aware of the allegations. Finally, Marshall fled to Connecticut early in the morning after his interaction with A.M.—as soon as he heard that there were allegations being made that he had raped her. He was arrested there two weeks later.

In sum, the jury did not convict Marshall based primarily on A.M.'s statement at Sunflower House—had that been the case, then maybe the trial would have played out differently. See *Mullins*, 30 Kan. App. at 2d 717-18 (finding that trial counsel's decision not to consult an expert in child interviewing techniques prejudiced the defendant in an aggravated indecent liberties case because defendant was convicted based largely on the victim's statement and no other physical evidence). If we wholly discount A.M.'s

10

interview at Sunflower House, or if we assume the jury had heard Barnett's testimony discounting Coughlin's interview techniques, there was still more than enough evidence for a jury to find Marshall guilty.

The record shows that the district court considered Barnett's testimony and the totality of the evidence presented at jury trial. The record also shows that based on these considerations the district court made extensive findings of fact that supported its legal conclusions. Ultimately, the district court correctly found that Page's deficient performance did not prejudice Marshall at trial. As a result, we affirm the district court's denial of Marshall's 60-1507 motion.

Affirmed.