NOT DESIGNATED FOR PUBLICATION

No. 127,775

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

JASON A. PETERS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Submitted without oral argument. Opinion filed May 15, 2026. Convictions affirmed, fees vacated in part, and case remanded with directions.

*Sam Schirer,* of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett,* assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

HURST, J.:  A jury convicted Jason A. Peters of three sex-related crimes that resulted in him being sentenced to life imprisonment. Peters appeals, claiming four trial errors and challenging two fees assessed as part of sentencing. While the trial was not error-free, this court finds none of the asserted errors resulted in prejudice requiring reversal of Peters' convictions. As such, Peters' convictions are affirmed. However, this court partially agrees with Peters regarding the fees, and finds that the district court erred in assessing a witness fee. Therefore, the witness fee in the district court's order is

1

vacated. The case is remanded with directions to enter a corrected journal entry. Convictions affirmed. fees vacated in part, and case remanded with directions.

FACTUAL AND PROCEDURAL BACKGROUND

On May 6, 2022, the State charged Peters with three counts of off-grid aggravated indecent liberties with a child. Each count alleged that Peters had lewdly touched Jane (a pseudonym), a child under 14 years of age, on different occasions during the time between January 17, 2021, and January 17, 2022.

Before trial, the State sought to admit prior bad acts evidence pursuant to K.S.A. 60-455. Peters acquiesced to the admission of his 2004 conviction for possession of child pornography in military court. Peters also did not contest the admission that his military conviction required him to register as a sex offender.

Over a defense objection, the court ruled that the State could admit other pieces of evidence pursuant to K.S.A. 60-455(d). One was evidence that Jane reported that Peters had talked about recording a video of him touching the private areas of her body. Another was testimony from Peters' half-sister, Megan (a pseudonym), that Peters sexually abused her when he was a teenager and she was about 7 or 8 years old. This evidence included a letter from Peters apologizing for hurting Megan without admitting to specific acts. However, the court ruled that evidence that Peters had viewed pornography with Megan as "sex education" was inadmissible under K.S.A. 60-455(a) or (b).

Because Peters challenges the admissibility of certain evidence related to prior bad acts, it is necessary to address the underlying facts of the case. During the trial, the State identified three acts that could support convictions on its charges: a guilty verdict on count one required a finding that Peters had indecently touched Jane in a shed; a guilty verdict on count two required a finding that Peters had indecently touched Jane on a

2

living room couch on a specifically described occasion; and a guilty verdict on count three required a finding that Peters had indecently touched Jane on the living room couch on at least one other occasion.

At trial, the State first called Jane's grandmother, Clara (a pseudonym). Clara testified that on April 28, 2022, she took Jane to Walmart and that, while in the bathroom, Jane, who was five years old at the time, asked Clara if she could tell a "secret about [Peters]." Jane then disclosed that Peters had "touched me on my privates and he could have hurt me." Once home, Clara took Jane aside and asked what Jane had meant. Jane reiterated that Peters "touched her" on "[h]er private parts, her vagina." Clara asked Jane if she had told anyone else, and Jane indicated she had said something to her mother, Lisa (a pseudonym).

A few days later, Lisa and Peters took Jane and Jane's younger sibling to Clara's house for dinner. Clara pulled Lisa aside privately and shared what Jane had told her; Lisa appeared to be shocked. Lisa then spoke to Jane privately and, after a discussion with Clara, the women took Jane and her sibling to the police station.

A lieutenant with the Derby Police Department testified that she met with the group. Clara wrote out a witness statement recounting Jane's disclosure at Walmart. Clara's statement elaborated that Jane had told her that Peters "pulled my pants opened [*sic*] and put his hands on my girl parts" after he had taken her into a shed with him. Lisa also wrote out a witness statement and spoke with the lieutenant. In her statement, Lisa wrote that Jane had said that Peters "told her not to tell anyone."

Clara, Lisa, Jane, and the younger sibling also met with a detective with the Exploited and Missing Children's Unit (EMCU), a joint investigative unit working as part of the Department for Children and Families. The detective testified that she was trained to interview children through open-ended questions and that she interviewed Jane. During

3

her forensic interview, Jane told the detective that Peters had placed his hands on her "girl parts" and that she was uncomfortable with it. Jane added that Peters had done this more than one time in the past but that he no longer did so. According to Jane, her "girl parts" had been inappropriately touched on at least three occasions—once in a shed beside her house and at least twice on her living room couch. Jane described this happening while her clothes were still on but said that Peters also went under her clothes and touched her girl parts and moved his hand around. Jane also asserted that Peters had asked her not to tell anyone whenever he had finished touching her inappropriately.

On May 9, 2022, Lisa and Clara took Jane to Wesley Medical Center where she was visited by a forensic nurse and Sexual Assault Nurse Examiner (the SANE or nurse examiner). The nurse examiner testified that in a private conversation with Jane, the child was able to describe her body parts and said "my dad inappropriately touched me and I did not like that. It made me uncomfortable." Jane told the nurse examiner that Peters touched her under her clothes, that it had been a while since it happened, and that he told her not to tell anyone—which made her scared to tell her mom. Over a continuing objection by defense counsel, the nurse examiner testified that Jane stated Peter "almost made me take a video of [him touching her girl parts]" and that she said "[h]e said he wants me to record it." Jane told the nurse examiner she did not know whether the video happened. The nurse examiner said there was no acute or healed injury noted during the physical examination.

Because Jane mentioned a possibility that abuse had been recorded, which was not something covered in her initial interview, she was called in for a follow-up interview. On May 19, 2022, Jane was interviewed by a social worker at EMCU, and she told the interviewer that Peters was in jail for touching her inappropriately. Jane said Peters used his finger to touch her girl parts and she repeated that Peters had conveyed a desire for her to record inappropriate touching but said he "never did it." Otherwise, she did not expand on the disclosures made in her prior interview.

4

At trial, Jane, then six years old, offered testimony that substantially aligned with her pretrial disclosures. Jane testified at trial about Peters touching her "private part" in the shed. Jane said she did not remember whether he touched her over or under her clothes, but she said he touched her with his hand and that his hand moved. She also said he touched her more than one time while on the couch, but she could not provide a number. Jane said she thought she remembered Peters saying he wanted to videotape the inappropriate touching. She said Peters told her not to tell anyone, and she testified that it was a "bad secret to keep" because "he was supposed to keep me safe and he did something bad to me instead."

Also at trial, Clara testified that she initially thought her daughter Lisa's romantic relationship with Peters was inappropriate because Peters was so much older—only 2 years younger than Clara—while Lisa was 15 years old. Lisa testified that she began dating Peters when she was 16 years old, they got married two weeks after she turned 18, and she graduated high school while pregnant with Jane. Clara said that she went to the police station to try to get Peters arrested for dating her minor daughter, but nothing was done.

The State called Megan as its final witness. Megan testified that Peters was her half-brother who came to live with her family when she was seven or eight years old. She testified that Peters, who was 14 or 15 at the time, watched her alone after school. She recounted that Peters first touched her vagina over the clothes but that it escalated over the course of 5-10 months to Peters performing oral sex on her and Peters making an unsuccessful attempt to penetrate her vagina with his penis. Megan said that Peters stopped the abuse after she confronted him. At age 11—about 3 years later—Megan told her parents, who asked Peters to leave the home. Peters enlisted in the Air Force shortly thereafter, and Megan testified that Peters wrote her a letter in May 2001 in which he apologized for hurting her and betraying her trust but also said that "some stuff you've

said is not true." The State then rested its case. Peters moved for a judgment of acquittal, which the district court denied.

The defense presented the testimony of a coworker and friend of Peters, who testified generally to his impressions of Peters' character. Peters also testified in his own defense. He acknowledged that he was court-martialed after 6 years in the Air Force for possession of child pornography and that he spent his last 19 months of service in military confinement. He said he had been through sex offender education and received counseling while incarcerated.

Peters denied ever having inappropriately touched, filmed, or photographed Jane. Peters did, however, recall three incidents that Jane may have misinterpreted or misremembered when making her disclosures. First, he claimed that once, as he was drying her off after a bath in the living room by the family couch when she was about four years old, she giggled when he dried her vaginal area, and it scared him. Peters suggested this as an innocent explanation for one of the instances Jane described in the living room. Peters claimed that afterward, he stopped giving Jane baths, buckling her in the car, or even dressing Jane, and he talked to Lisa about it because he could not take chances with his background.

Peters described a second event when he was on the couch watching television one morning while Lisa and Jane's younger sister were still asleep. Peters claimed that Jane came out of her room, presumably to go sleep with Lisa, but she ended up snuggling him on the couch in her underwear. He claimed that Jane would not stop wiggling her rear, so he asked her what was going on and she said her girl parts were hurting. He asked her to confirm, and Jane said yes and spontaneously pulled down her panties. He claimed that Jane said it was hurting "down low" and that she pointed. Peters said that he repeated this to Jane, while pointing at her vagina, and Jane said yes and then pulled her panties back up. Peters said that he told her they would tell Lisa when she woke up.

Finally, Peters described a third incident, which occurred while he was gardening in his yard. When he was in his shed gathering supplies, Jane ran over to help him. Peters said he noticed that Jane's panties were sticking out of the zipper. He said that in maybe ten seconds, he grabbed the top of her pants, pushed the zipper down, and zipped it up for her. Peters also testified that the gardening project he was working on at the time was a "fairy garden," which he later told Jane to keep secret so that he could surprise Lisa with their progress on it.

On cross-examination, Peters acknowledged having a previous addiction to a variety of pornography that depicted sexual abuse of children and that he had collected it. He testified to the specific types of images of children he would view, including images of adults engaged in sexual acts with children. He explained that his addiction was in his past but was no longer an issue. Peters also testified that he had a good relationship with Jane.

Following closing arguments, the district court gave the jury its instructions. During deliberations, the jury asked a single question: "Is it specific incidents that are Count 2 & Count 3[?]"After a conference with the parties, the court answered, "Yes," and, within minutes, the jury unanimously convicted Peters on all three charges. The district court denied Peters' posttrial motions and sentenced him to life in prison without the possibility of parole for 75 years. The district court also assessed three children's advocacy center fees "per statute." The journal entry of judgment includes a $60 witness fee, among others, though no witness fee was imposed on the record.

Peters now appeals.

DISCUSSION

On appeal, Peters raises four trial errors that he contends deprived him of a fair trial:

1. The prosecutor violated an order in limine and thus the district court erred in denying his request for a mistrial;
2. the prosecutor erred in closing argument by stating that a young child was unable to fabricate stories and thus vouching for the victim's credibility;
3. the district court erred in admitting certain prior bad acts evidence; and
4. cumulative errors deprived Peters of a fair trial.

Peters also raises two allegations of error related to fees imposed as part of his sentence.

## I. NO ERROR IN DENYING REQUEST FOR MISTRIAL DUE TO VIOLATION OF ORDER IN LIMINE

Peters argues the prosecutor violated a pretrial order in limine during opening statement and the district court erred in denying Peters' related motion for mistrial. Peters contends the prosecutorial error was so prejudicial that his convictions must be reversed.

Prior to trial, the district court ruled on various requests related to the State's desire to admit evidence of Peters' prior misconduct. In one such ruling, the district court denied the State's request to introduce evidence that Peters watched adult pornography with Megan for "sex education" purposes. The court found that this evidence was not relevant to the charged conduct under K.S.A. 60-455(d) aside from the potential to demonstrate propensity for sexual misconduct generally, making it inadmissible under K.S.A. 60-455(a) and (b). Therefore, the court prohibited the prosecutor from introducing the evidence.

In contravention of that order in limine, however, the prosecutor brought up the inadmissible evidence that Peters allegedly watched pornography with Megan for "sex education" during its opening statement:

"[The detective] learned from [Megan], and you will hear from her as well, when [Megan] was between the ages of seven and eight the defendant was brought into their home. He was a teenager at the time, 15, 16. . . .

"So starting about seven or eight she would describe how it started to become sexual between him and her. *One of the things that he would do is have her watch pornography with him. He called it sex education*." (Emphasis added.)

Following the prosecutor's opening statement, defense counsel objected to the prosecutor's statements about the pornography and requested a mistrial. The district court reviewed the record of its rulings and agreed that the prosecutor's statement was contrary to the court's order. The only question remaining was the appropriate remedy.

With the parties still gathered at the bench, defense counsel expressed concern that the statement would deprive Peters of a fair trial. The prosecutor argued the prejudice could be cured without a mistrial, particularly considering the other evidence that would be admitted against Peters. Defense counsel argued the error was too prejudicial to cure through an instruction because of the emphasis the prosecutor placed on it in her opening statement and—as the court previously found in its ruling on the motion in limine—there was very little probative value to the evidence.

The district court ultimately denied Peters' request for a mistrial. The court reasoned that the prosecutor's statement had low relative shock compared to the other charges in the case and that there was other evidence that was going to be admitted in a similar "category of evidence," including Peters' military conviction for child

9

pornography and the allegation that Peters suggested recording child pornography with Jane.

The district court offered to give an immediate, specific limiting instruction to the jury or a specific written instruction to the jury at the end of the case, directing the jury to disregard the statement about Peters having Megan watch porn with him for "sex education." To minimize the attention drawn to the issue, defense counsel instead requested an immediate admonition to the jury that the statements of counsel were not evidence—without mention of the specific issue the parties discussed at the bench. The court agreed and gave that instruction once the proceedings resumed.

An appellate court reviews a district court's denial of a motion for mistrial for an abuse of discretion. *State v. Fraire*, 312 Kan. 786, 790, 481 P.3d 129 (2021); *State v. Logsdon*, 304 Kan. 3, Syl. ¶ 5, 371 P.3d 836 (2016). In general, a district court abuses its discretion when its decision is (1) arbitrary, fanciful or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 304 Kan. 3, Syl. ¶ 5. Applying this standard of review to a motion for mistrial related to prosecutorial error, the appellate court must first determine whether an error occurred, and second, if an error occurred, whether that error constituted reversible error by way of "prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice[.]" *State v. Carr*, 314 Kan. 744, Syl. ¶ 24, 502 P.3d 511 (2022).

A mistrial is appropriate when the district court finds that "prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). The heart of this determination is whether that conduct "created a fundamental failure in the proceeding" and whether that error "made it impossible to continue the proceeding without denying the parties a fair trial." *Fraire*, 312 Kan. at 790.

10

Based on the State's acknowledgment and the district court's finding, this court assumes the prosecutor's conduct violated Peters' constitutional rights and "created a fundamental failure in the proceeding." See *Fraire*, 312 Kan. at 790. Therefore, the court moves on to the second step to determine whether reversible prejudicial error occurred that was not cured or mitigated by the district court's admonition to the jury. See 312 Kan. at 792. In determining whether reversible prejudicial error occurred, the primary question is whether the error "affect[ed] the outcome of the trial in light of the entire record . . . ." 312 Kan. at 792.

Simply finding that the prosecutor violated the order in limine means that Peters suffered some degree of prejudice. See *State v. Santos-Vega*, 299 Kan. 11, 25, 321 P.3d 1 (2014) (explaining prejudicial effect of violations of orders in limine). The Kansas Supreme Court has explained that violations of orders in limine have an intrinsically prejudicial effect, "because the requisite for obtaining such orders is showing that the mere offer or reference to the excluded evidence would tend to be prejudicial." 299 Kan. at 25. While there may be some prejudice, however, not every violation of an order in limine requires the district court to order a mistrial or this court to find reversible error, because the "[p]rejudice may be slight or amenable to cure when viewed in context." *State v. Sims*, 308 Kan. 1488, 1497, 431 P.3d 288 (2018).

Where a defendant's constitutional right to a fair trial is implicated, an error must be assessed under the constitutional harmless error standard which asks whether "the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); see also *Carr*, 314 Kan. at 773. That means "'there is no reasonable possibility the prosecutor's error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

11

When reviewing the entire record, the prosecutor's erroneous statement was of such a similar nature and character to evidence properly before the jury that it was not overly prejudicial. See *State v. Moyer*, 306 Kan. 342, 357-58, 410 P.3d 71 (2017) (applying the same reasoning). In other words, the statement that Megan had experienced watching pornography with Peters, who referred to it as "sex education," was of a similar nature to propensity evidence like Peters' prior conviction for possession of child sex abuse images and Megan's testimony that Peters had sexually abused her. The erroneous statement was made once, not repeatedly, and was not more likely to inflame the jury or make a reasonable juror more likely to believe the other admissible testimony. The district court drew this same conclusion.

Peters argues that the district court failed to account for the cumulative prejudicial effect of propensity evidence. He also argues that because the State's case was "so weak," the violation may have been that "extra bit" the jurors needed to return guilty verdicts. Peters' arguments ring hollow.

The district court had already ruled on the admissibility of other evidence of the same character, which ameliorates the prejudicial effect of the prosecutor's violation. See, e.g., *Moyer*, 306 Kan. at 358 ("[T]he prejudicial effect of the challenged evidence was ameliorated by the fact that there was properly admitted inculpatory evidence of the same ilk."). Megan testified about her personal experience being sexually abused by Peters as a child. There was also substantial evidence presented concerning Jane's disclosures. Additionally, the prosecutor's error was promptly addressed by the district court's instruction to the jury that counsel's arguments were not evidence. There is no reasonable possibility that the prosecutor's single comment during opening statement that Peters watched pornography with Megan and called it "sex education" affected the outcome of the trial when considering the record as a whole. Peters has failed to show the district court abused its discretion in denying the motion for mistrial.

II. The Prosecutor's Closing Statements Are Not Reversible Error

Peters next alleges the prosecutor's statement during closing that young children are incapable of fabricating claims of sexual abuse amounted to witness vouching, which was unsupported by trial evidence and may have impacted the jury's verdict. The State concedes that the prosecutor's statement was not supported by evidence but argues the error was harmless.

During closing arguments, the prosecutor attempted to reinforce Jane's credibility by suggesting that her young age meant that she was honest in her testimony and had no reason to fabricate a story:

"So now the instructions tell you that you get to weigh credibility and give weight and credit to everything you heard, everything you heard. You can use your common knowledge and experience in doing that. I'd suggest from the evidence you ask yourselves what motive did she have to fabricate any of this. There has been no motive given. She was only four to six years of age. At that age you don't really conceive the complexities of the issues that we dealt with over the last couple days. Four to six. All she knows is what happened to her. Fabricating something like that, that would have to have such a mindset that a child that age would never have."

The prosecutor did not just imply she was credible, or too young to have a motive to fabricate stories, but also implied that the interview methods demonstrated veracity:

"Listen to her interviews. If this was fabricated, every opportunity she would have been given to make it worse she would have taken. If this was something where she's trying to get attention, as argued by counsel, she would have made it bigger. Did it go in the line, yeah. Did he touch your butt, sure. Did you see his penis, yes. But she stuck to what happened, hands on her private part or her girl part. They gave her every opportunity, showed her diagrams, talked about the male parts, talked about the girl parts. She never took that bait. She never said. She kept it to exactly what she said he'd done to her. Think about that when deciding."

13

Peters did not object at the time, but because of the nature of trial proceedings, appellate courts review prosecutorial errors during closing argument even absent a timely objection. However, the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021), *abrogated on other grounds by State v. Stubbs*, 320 Kan. 568, 570 P.3d 1209 (2025).

This court employs the same two-step process to evaluate claims of prosecutorial error as used above; first deciding whether there was error and, if so, then determining whether the error was harmless. *State v. Mendez*, 319 Kan. 718, 737, 559 P.3d 792 (2024). A prosecutor's error is harmless if the State shows "there is no reasonable possibility that the error contributed to the verdict." *State v. Ninh*, 320 Kan. 477, 495, 570 P.3d 1169 (2025).

First, this court must determine whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. *Mendez*, 319 Kan. at 738. A defendant meets the first prong by establishing that the prosecutor misstated the law or argued a fact or factual inferences outside of what the evidence showed. 319 Kan. at 738. In determining whether a prosecutorial error occurred, this court must also consider the statements in context, rather than in isolation. 319 Kan. at 738.

Peters contends the statements constitute vouching, which the State disputes. Vouching—when a prosecutor offers his or her opinion as to the credibility of a witness—is improper. *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016). Such comments constitute "'unsworn, unchecked testimony, not commentary on the evidence of the case.'" 304 Kan. at 835. "A prosecutor, however, 'may explain the legitimate factors which a jury may consider in assessing witness credibility and may argue why the factors present in the current case should lead to a compelling inference of truthfulness.' [Citations omitted.]" 304 Kan. at 835. The appropriateness of a prosecutor's point will often hinge on how the statement is phrased. 304 Kan. at 835. As an example, the Kansas

Supreme Court has explained that "'The evidence contradicts the defendant's statement,' is acceptable, whereas, 'I don't believe the defendant's statement is credible,' crosses the line." 304 Kan. at 835.

Here, even though the prosecutor did not say "I believe" or "the State believes," she insinuated that Jane was categorically incapable of lying. The prosecutor stepped outside the wide latitude allowed when she said that a child Jane's age could "never" have the mindset to fabricate allegations of sexual abuse. See *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000) (finding that "characterization of the prosecutor's statement that a defendant is lying, as a comment on the evidence, misses the mark" and explaining that "*expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony,* not *commentary on the evidence of the case.*"); see also *State v. Morris*, 40 Kan. App. 2d 769, 787-88, 196 P.3d 422 (2008) (discussing improper vouching as a form of placing the weight of the State behind the prosecutor's beliefs about matters outside the evidence). Even if the prosecutor's statement did not place the power and prestige of the State behind her personal beliefs, the statement claimed a level of certainty that was unsupported by the evidence. See *State v. Waldschmidt,* 318 Kan. 633, 655, 546 P.3d 716 (2024) ("[Prosecutors'] arguments must remain consistent with the evidence; error occurs if prosecutors assert facts or inferences not supported by the evidence."). While the prosecutor possessed the latitude to draw reasonable inferences about witness credibility from the evidence presented at trial, no evidence supported this statement.

After finding error, this court must next assess its prejudicial effect. See *Mendez*, 319 Kan. at 737. The error is not reversible if the State can demonstrate beyond a reasonable doubt that the error did not affect the trial outcome. *Brown*, 316 Kan. 154, Syl ¶ 2 (explaining the constitutional harmlessness inquiry). The prosecutor's statements on credibility, though outside the proper bounds, were surrounded by reasonable and supported comments about Jane's credibility. The strength of the State's case has already been discussed, and there was no evidence introduced specifically undermining Jane's

15

credibility (which is presumably what the prosecutor was intending to convey), although generally the credibility of the victim is an issue in sex offense cases. The State had several witnesses who explained how Jane's statements were made and demonstrated their consistency over time and in different interviews. Moreover, the jury received an instruction that the statements or arguments of either attorney were not evidence. "Appellate courts often weigh these instructions when considering whether any prosecutorial error is harmless. In doing so, we presume the jurors follow the instructions." *Brown*, 316 Kan. at 170. When viewing the record as a whole, the prosecutor's error in closing arguments was constitutionally harmless in that there was no reasonable possibility the prosecutor's error contributed to the verdict, and thus it did not affect the outcome of the trial. See *Sherman*, 305 Kan. at 109.

III. THE DISTRICT COURT DID NOT ERR IN ADMITTING K.S.A. 60-455 EVIDENCE

Peters argues the district court abused its discretion by admitting, over Peters' objections, prior bad acts evidence pursuant to K.S.A. 60-455(d) that related to two separate events. First, Peters contends the court erred by admitting evidence that Peters suggested to Jane that they record a video of him sexually touching her. Second, Peters argues the court erred by admitting evidence that he had sexually abused Megan when he was a teenager. During trial, defense counsel renewed its pretrial objections when the State sought to admit the evidence at issue. The parties agree that Peters made timely and specific challenges and thus preserved this issue for appeal.

Undoubtedly this type of prior bad acts evidence used to show propensity, which is a defendant's tendency or inclination to behave in the same manner as the charged offense, can be prejudicial. See *State v. Gunby*, 282 Kan. 39, 48-49, 144 P.3d 647 (2006) (discussing propensity evidence). That is why prior bad acts evidence is generally inadmissible and treated with extra consideration when admitted. See K.S.A. 60-455(a). In a criminal action, generally, "evidence that a person committed a crime or civil wrong

16

on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." K.S.A. 60-455(a). However, where the defendant is accused of a sex offense, which is the circumstance here, "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 60-455(d); see also *State v. Boysaw*, 309 Kan. 526, 534-36, 439 P.3d 909 (2019) ("Kansas has a long history of allowing propensity evidence in these kinds of cases.").

In a sex offense trial, before propensity evidence is admitted the district court must consider whether the probative value of the evidence outweighs its prejudicial effect. *State v. White*, 316 Kan. 208, 215, 514 P.3d 368 (2022). When assessing the probative value of evidence of other crimes or civil wrongs, "the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence." *Boysaw*, 309 Kan. 526, Syl. ¶ 8. When considering the prejudicial effect of such evidence, the court should "consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." 309 Kan. 526, Syl. ¶ 9.

An appellate court reviews a district court's decision to admit or exclude evidence under K.S.A. 60-455(d) for an abuse of discretion. *State v. Jones*, 313 Kan. 917, Syl. ¶ 1, 492 P.3d 433 (2021). A district court abuses its discretion in issuing an order that is (1) arbitrary, fanciful or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Hillard*, 315 Kan. 732, 760, 511 P.3d 883 (2022). The erroneous admission or exclusion of evidence is subject to review for harmless error under K.S.A.

60-261. If the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard. See *State v. Thornton*, 312 Kan. 829, 832, 481 P.3d 1212 (2021).

*Jane's Statement about Recording Sexual Touching*

In its pretrial motions, the State sought permission to admit a disclosure the State contends Jane first made to the nurse examiner. According to the State, Jane told the nurse examiner that Peters "'almost made me take a video of it (clarifies him touching her girl parts). He said that he wants me to record it.'" The nurse examiner noted: "When asking [Jane] if that ever happened she said she didn't know." As Peters concedes on appeal, the district court conducted the four-factor analysis outlined in *Boysaw* for both categories of evidence he alleges were wrongly admitted. See 309 Kan. 526, Syl. ¶¶ 7-9 (outlining the analysis of probative value over prejudicial effect of prior bad act evidence). As to how clearly the prior act of soliciting sexually inappropriate videos from Jane was proved, the district court found:

> "The evidence that supports [Jane's] statement to the SANE nurse and then relayed to the detective is as credible as that which supports the evidence that bound defendant over to proceed to trial as well as that which is necessary to convict Mr. Peters of the crimes charged. By its nature, it is clearly as proveable as [Jane's] other statements and the State's other evidence."

As to how probative the video solicitation evidence was of the material fact sought to be proved, the district court found the acts supported Peters' propensity:

> "The evidence of the defendant's other sexual misconduct is particularly probative in that it specifically and logically proves, again, if believed, defendant's propensity to commit a crime of a similar nature by an individual who has a prior conviction of possessing child

18

pornography, again, visual depictions of children engaging in sexually-explicit conduct, which is what this video would be doing."

As to how seriously disputed the material fact is, the district court found: "Again, Mr. Peters. . . has pled not guilty, is vigorously defending the allegations in this case. We can see that in pretrial motions and arguments and so forth." And finally, as to whether the government can obtain any less prejudicial evidence, the district court found:

> "There appears to be no less prejudicial evidence the State can utilize to prosecute its case and present the evidence. I don't believe there will be any additional witnesses as it pertains to this evidence. The witnesses that will testify to this are already endorsed, available, and necessary for the charged crimes."

Peters argues the district court's probative value analysis was flawed for two reasons. First, he argues the evidence was "minimally established" because a five-year-old's uncorroborated allegation of uncharged criminal conduct is minimally probative. Peters does not provide any further support or analysis for his argument. And he does not explain why the district court's determination that the evidence supporting Jane's statement was credible is a mistake of fact, a mistake of law, or unreasonable. Moreover, to the extent Peters' argument that the evidence of Jane's statement was "minimally established" requires this court to reweigh the district court's contrary determination—it cannot engage in such reweighing. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023) ("To the extent the district court's exercise of discretion is informed by findings of fact, appellate courts will not reweigh evidence or reassess witness credibility.").

Second, Peters argues the challenged evidence was cumulative in light of his acquiescence to the admission of evidence that he had been previously convicted of possessing child pornography. Peters also fails to support his second reason. Peters simply reasons that the district court overstated the probative value of this evidence given the State's ability to use other well-established propensity evidence. But again, Peters

19

fails to demonstrate—nor does a review of the district court's order reveal—anything arbitrary, fanciful, or unreasonable about the court's ruling on the probative nature of the evidence. Jane's statement to the nurse examiner that Peters suggested recording sexual acts with her aligned with his admitted past conviction for possession of child pornography, but it also uniquely lent credibility to Jane's disclosures and testimony.

Finally, as to the prejudicial effect, that is the likelihood that the evidence would contribute to an improperly based jury verdict, the district court found it would not:

> "I am finding it's unlikely that the proposed evidence will contribute to an improperly-based jury verdict.
> "The allegations rise and fall by way of the testimony of the fact witnesses. Evidence supporting this allegation by the alleged victim is closely connected to the alleged crimes. The defendant will have the opportunity to test the veracity of the child's testimony through cross examination. Of course, again, this would apply to all parts of this analysis. A properly instructed jury is presumed to follow the law, and we will be very careful in instructing on the law."

The district court concluded the evidence would not distract the jury from the central issue as it came through the same witness and was "essentially part of the charged crimes."

Peters argues the district court's assessment was flawed because the district court underestimated the likely prejudicial effect of the evidence. He contends that the jury "may have been inflamed by the unsubstantiated suggestion that [Peters'] alleged misconduct went further than mere improper touching." Peters argues the resulting outrage may have directed the jurors toward a guilty finding they were not otherwise predisposed to reach.

20

Although it is possible that the allegation that Peters communicated an intention to record sexual acts with Jane was prejudicial, there is no demonstrated reversible error. This evidence constituted a small portion of the trial and was not of such nature that it was out of character of the other evidence to increase its prejudicial effect. The State's case consisted of multiple witnesses who testified about the offense with supporting exhibits. Jane provided crucial testimony that went far beyond this single statement. For those reasons, Peters fails to show an abuse of the district court's discretion in admitting this evidence.

*Allegations of Prior Sexual Abuse of Megan*

Peters also alleges the district court erred in admitting the evidence that he allegedly sexually abused Megan when he was a teenager. In its pretrial motions, the State proffered that Megan would testify that Peters sexually abused her over several months between 1995-96 when she was 7 or 8 and Peters was 15 or 16. The abuse was proffered to have begun with over-the-clothes touching during Megan's "sleep overs" in Peters' bed; over time, the events escalated to penetration and oral sex. Megan claimed the abuse stopped when she confronted Peters after she watched a movie in which a girl was being abused by her father. It was conceded that these incidents were not reported to law enforcement nor was Peters ever charged with any crime in connection with Megan's allegations. The State proffered, however, that after Peters moved out of the home and joined the military "he wrote [Megan] a letter apologizing to her for everything he had done to her without specifying the acts he was referring to."

Just as with the propensity evidence discussed above, the district court conducted the required analysis of the probative nature of the evidence and the potential for undue prejudice. Peters contends that the probative value of Megan's allegations was undermined by their "stale nature" due to the passage of time since their purported occurrence. He also claims that the district court did not adequately account for the

diminishment of the value of this evidence in light of fact that other well-established propensity evidence would be admitted.

As to the probative value of Megan's allegations of sexual abuse, the district court found the acts supported Peters' propensity, particularly related to similar aged children:

"It supports a disputed fact at issue in the current case, that fact being the propensity or disposition to commit acts of sexual misconduct and commit crimes similar to the crimes presently charged. . . .

"It is also probative in that the prior acts of sexual misconduct have a logical tendency to prove a material fact, which is Mr. Peters' propensity to commit acts of sexual misconduct. The principal probative value is the sexual misconduct committed against a young prepubescent female child.

"The similarities in the nature of the prior acts of sexual misconduct and the class of victims, again young female children, apply to the currently charged case."

Contrary to Peters' argument, the record shows that the district court also considered the staleness of this evidence before ultimately finding that the similarities increased the probative value:

"Number six, the time period between the two dates of incident is between 23 and 26 years. As the court considered in *State v. Cross*, 216 Kan. 511, [532 P.2d 1357 (1975)] back in 1975, it states as a quote: [']Generally, the remoteness in time of a prior conviction, if otherwise admissible, affects the weight of the prior conviction rather than its admissibility. As the time interval between the prior offense and the present offense for which the defendant is on trial lengthens, the probative value of the prior conviction progressively diminishes.[']

22

"Now, the Tenth Circuit Court of Appeals stated in [*United States v.*] *Benally*[*,* 500 F.3d 1085, 1092 (10th Cir. 2007)] that, [t]here is [']no bright line rule regarding the timing of charged conduct relative to prior acts.' . . . . Then in . . . [another] Tenth Circuit case, the same court stated that sufficient factual similarities can rehabilitate evidence that might otherwise be inadmissible due to staleness."

The district court also noted the dissimilarities between the allegations made by Megan and the ones at issue in Jane's trial. Specifically, it noted that the acts with Megan "escalated beyond [the act] that is alleged in the current case as well as the defendant's relative age to the girls." The court then explained that "when viewed through the lens of probative value, the similarities outweigh the dissimilarities . . . ." The district court thoroughly discussed the similarities of the victims, the relationships, and the acts to determine that the length of time between the two alleged acts (the alleged abuse of Megan and charged offenses related to Jane) did not diminish the probative value.

Peters alleges no error of law or fact regarding the district court's staleness assessment, nor does he convincingly demonstrate it was unreasonable. The district court properly considered the probative value of the evidence relative to the staleness of Megan's allegations and correctly noted there is no brightline rule. See *United States v. Benally*, 500 F.3d 1085, 1092-93 (10th Cir. 2007) (explaining the need to weigh probative value and that there is no bright line rule of staleness). "Remoteness in time, standing alone, is insufficient to establish reversible error" related to the admissibility of prior bad act evidence. *State v. Carter*, 220 Kan. 16, 20-21, 551 P.2d 821 (1976). Rather, the remoteness in time goes to the probative value, which the district court properly and thoroughly considered.

Peters also claims that the district court underestimated the prejudicial effect of the evidence. He argues that upon hearing an allegation that Peters had previously abused Megan, jurors may have closed their mind to the possibility that Peters was innocent of the charges alleged in this case. The jury may have also decided to convict Peters on the

basis that he deserved punishment for what he may have done in the past. While Peters may have been more likely to suffer prejudice from the evidence of Megan's allegations than the other evidence admitted under K.S.A. 60-455(d), Peters fails to show the district court's conclusion was so lacking as to constitute an abuse of discretion. See *White*, 316 Kan. at 216-17 (finding defendant's confession to a prior crime not unduly prejudicial).

The district court weighed the potential prejudice relative to the probative value as required and found it was not unduly prejudicial—although it was "derogatory or detrimental." The court noted evidence tending to demonstrate the validity of the prior act—although it was not reported to law enforcement, Megan's parents required Peters to leave the home, and Peters wrote Megan a letter that demonstrated evidence of culpability. Peters points to no error of law or facts regarding the district court's prejudice determination, and this court cannot say the district court's decision was so unreasonable as to constitute an abuse of discretion. While not all courts would agree or make the same decision, "[w]here reasonable minds can differ, discretion has not been abused." *State v. Broyles*, 272 Kan. 823, 841, 36 P.3d 259 (2001).

## IV. CUMULATIVE ERRORS DID NOT DENY PETERS' RIGHT TO A FAIR TRIAL

Peters argues that cumulative errors deprived him of a fair trial. There are two conceded trial errors, the first being the prosecutor's comment in opening statement that violated the order in limine and the second being the prosecutor's statement in closing about the non-fabricating mindset of a four- to six-year-old. This court has already determined that both of those errors were individually constitutionally harmless and now considers them together.

"Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such that they cannot be determined to be harmless . . ." *Carr*, 314 Kan. 744, Syl. ¶ 28. "Cumulative trial errors, when considered collectively, may require

24

reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Moyer*, 309 Kan. 268, Syl. ¶ 7, 434 P.3d 829 (2019). Moreover, "[i]f any of the errors being aggregated are constitutional in nature—such as prosecutorial errors—the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome." *Mendez*, 319 Kan. at 741.

These individually constitutionally harmless prosecutorial errors did not cumulatively affect Peters' right to a fair trial. This court already explained why these errors individually were constitutionally harmless, and there is nothing about their character or circumstances that collectively changes that harmlessness evaluation. The errors were not related to the same issue and were not made close in time to each other. Additionally, the overall strength of the evidence here weighs against a finding that these unrelated and individually constitutionally harmless errors cumulatively impacted Peters' trial rights. See *Moyer*, 309 Kan. at 289-90 (finding that multiple trial errors did not require a reversal of defendant's convictions because the trial would have been no different based on the evidence). In other words, there is nothing about these errors that combines or accumulates to make their prejudicial effect more impactful together than separately. Therefore, the cumulative effect of the errors did not deny Peters a fair trial for the same reasons the individual errors did not have a prejudicial effect.

## V.  THE COURT DID NOT ERR IN ASSESSING CHILD ADVOCACY CENTER FEES

In the first of two arguments alleging errors in the district court's fee assessment, Peters contends the district court erred in its assessment of child advocacy center (CAC) fees by arguing he should have only been assessed one CAC fee despite his conviction on three criminal counts. During sentencing, the district court discussed the imposition of fees, including CAC fees. The prosecutor argued that Peters should be assessed a $400 CAC fee per count. In its ruling, the district court said:  "I am going to order the costs in

25

this case to be reflected in the journal entry. Aside from the normal costs, there's $427 for the SANE SART and then 400 times three for the child advocacy. I'm ordering—there's no restitution."

Peters' attorney generally objected to the district court's imposition of substantial fees against Peters, arguing that Peters would make around two dollars an hour at best for the rest of his life while working in prison. Peters' attorney explained that Peters should be assessed only a single $400 CAC fee. Pursuant to K.S.A. 20-370(a) a defendant is assessed CAC fees as follows: "On and after July 1, 2013, any defendant convicted of a crime under chapter 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court."

Peters contends that the district court erred by interpreting this statute to require the imposition of a discrete $400 fee for each of Peters' three convictions in his case. Peters argues that the plain language of the statute permits a district court to impose one CAC fee upon each "defendant convicted of a crime," as opposed to one CAC per conviction implicating a minor victim.

Peters acknowledges that a panel of this court reached a contrary interpretation of the statute in *State v. McDuffie*, No. 113,987, 2017 WL 2617648 (Kan. App. 2017) (unpublished opinion). In *McDuffie*—as an "issue of first impression"—the panel engaged in an extensive analysis of the statutory language and the legislative history of K.S.A. 20-370(a). 2017 WL 2617648, at *16-21. The panel ultimately held that the plain language of the statute allowed for two interpretations—one that required "defendants convicted of multiple crimes against minors . . . to pay the number of fees equal to the crimes committed against minors," and another that required "defendants convicted of any crimes against minors, regardless of number, . . . to pay just one assessment fee." 2017 WL 2617648, at *21. The panel held that based on the legislative history of the

26

statute, the Legislature intended to create the former interpretation—meaning a "one-to-one crime-to-fee" ratio. 2017 WL 2617648, at *17. Peters argues the *McDuffie* panel erred by going past what he contends is unambiguous language requiring "any defendant" to pay "*an* assessment fee."

After Peters filed his brief, another panel of this court decided this issue adversely to Peters' claim of error—this time in a published opinion. See *State v. Sanders*, 65 Kan. App. 2d 236, 261-64, 563 P.3d 234 (2025), *rev. denied* 320 Kan. 867 (2025). In *Sanders*, the panel also held that a district court did not err in imposing a CAC fee for each of defendant's four convictions. 65 Kan. App. 2d at 264. Rather than adopting the same analysis as the panel in *McDuffie*, however, the *Sanders* panel held that the language of K.S.A. 20-370(a) unambiguously required a defendant convicted of a crime against a minor victim to pay a fee for each crime committed against a minor. 65 Kan. App. 2d at 261-64.

In his reply brief, Peters argues that the *Sanders* panel read language into the statute that was not there—violating a rule of statutory construction—by comparing K.S.A. 20-370(a) to various fee statutes that explicitly set forth units of fee assessment "for each" or "for every" qualifying conviction within a case. See *Sanders*, 65 Kan. App. 2d at 263-64. Peters also submits that this court cannot presume—and argues that the *McDuffie* panel improperly presumed—that the Legislature enacted the statute for the purpose of exacting punishment. See *McDuffie*, 2017 WL 2617648, at *19 (finding that the legislative history establishes that the purpose of K.S.A. 20-370's fee is "(1) to punish defendants and (2) to raise revenue").

A third panel of this court also considered the same claim for relief in *State v. Mildfelt*, No. 126,968, 2025 WL 2815647 (Kan. App. 2025) (unpublished opinion), *rev. granted* 321 Kan. 793 (2026). The *Mildfelt* panel agreed that the language of the other sentencing statutes imposing fees on a criminal defendant for services rendered by

27

government agencies was "clearer" than K.S.A. 20-370(a). 2025 WL 2815647, at *3. The panel pointed to K.S.A. 28-176(a) for example, which "requires a defendant to pay a laboratory analysis fee to the [KBI] or other laboratory providing services 'for *every individual offense.*'" 2025 WL 2815647, at *3. The panel stopped there, however, finding that the defendant had not designated a record demonstrating that an error had occurred. 2025 WL 2815647, at *3. The panel ultimately affirmed the district court's assessment explaining: "Being unable to locate any alternative logic for the application of K.S.A. 20-370(a), we find the plain language discussion in *Sanders* compelling. Therefore, under this approach to statutory construction, Mildfelt's argument that K.S.A. 20-370(a) authorizes only one assessment fee fails." 2025 WL 2815647, at *4.

While this court notes that the Kansas Supreme Court has accepted review of *Mildfelt*, there is currently no decision that alters this court's analysis and it finds no basis to deviate from the analysis in *Sanders*. Here, a jury convicted Peters of three crimes relevant to K.S.A. 20-370(a). As a result, this court finds no error in the district court's order requiring Peters to pay an assessment fee in the amount of $400 for each conviction. Peters fails to demonstrate that the district court's assessment of $1,200 in CAC fees against Peters was done in error.

## VI. THE COURT ERRED IN ASSESSING WITNESS FEES

Finally, Peters also argues the district court erred when it assessed "the normal [court] costs" during sentencing but later entered a witness fee on the journal entry of judgment, which it had not orally pronounced. The district court did not specifically order a witness fee during sentencing, and the State did not request the fee. However, in the journal entry of sentencing, the district court assessed "Witness Fees" of $60.00.

The State concedes that because there is no authority for imposing a fee unless it is assessed and approved by the court on the record or fixed by statute, there was no

authority for imposing the witness fee via journal entry alone. The parties agree on this issue, and finding no reason to hold otherwise, this court finds the $60 witness fee was assessed in error. The only question is the procedural method for correcting the error. See *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019) ("[A]ny journal entry variance from a judge's oral pronouncement during sentencing is a clerical error that may be corrected at any time.").

Peters asks the court to remand the case for the district court to issue a nunc pro tunc order striking the $60 witness fee, and it appears that remedy is appropriate. See *Sanders*, 65 Kan. App. 2d at 264-65 ("The State concedes that the journal entry is incorrect and that the appropriate remedy is to remand with directions to correct the journal entry. We agree and so order."). Accordingly, the $60 fee is vacated, and the matter is remanded to the district court for a corrected journal entry reflecting no $60 witness fee.

CONCLUSION

Despite finding two prosecutorial errors, this court finds both were individually and cumulatively constitutionally harmless and did not violate Peters' right to a fair trial. Peters also failed to show that the district court abused its discretion in admitting certain prior bad acts evidence and denying Peters' motion for a mistrial. Further, the district court did not err in assessing a separate CAC fee for each of Peters' three convictions. However, it erred by including a witness fee in the journal entry without making such an assessment during the sentencing hearing. As a result, Peters' convictions are affirmed and the witness fee portion of Peters' sentence is vacated, and this matter is remanded so the district court can file a corrected journal entry.

Convictions affirmed, fees vacated in part, and case remanded with directions.

29